SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California  94102
Telephone:   (415) 392-6257
Email:        sminter@nclrights.org
              cstoll@nclrights.org
              awhelan@nclrights.org
              rberg@nclrights.org

JOSHUA ROVENGER*
DONOVAN BENDANA*
GLBTQ LEGAL ADVOCATES &
DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts  02108
Telephone:   (617) 426-1350
Email:        jrovenger@gladlaw.org
              dbendana@gladlaw.org

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:        ggrunfeld@rbgg.com
              kjanssen@rbgg.com

*motion for admission *pro hac vice* forthcoming

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| Z.A., a minor, by and through their parent, A.A.; Z.B., a minor, by and through their parent, B.B.; Z.C., a minor, by and through their parent, C.C.; Z.D., a minor, by and through their parent, D.D.; Z.E., a minor, by and through their parent, E.E.; and F.F., <br><br> Plaintiffs, <br><br> v. <br><br> LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, a California nonprofit public benefit corporation, <br><br> Defendant. | Case No.: 5:26-cv-4998 <br><br> **COMPLAINT** |

[6008648.4]

COMPLAINT

**INTRODUCTION**

1.     The federal government has pledged to shut down essential medical care for transgender minors. Days into office, the President issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," which declared it is not U.S. policy to "fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care.

2.     As part of this campaign to end pediatric transgender medical care, the Department of Justice ("DOJ") initially served "substantively identical" administrative subpoenas on healthcare providers across the country demanding the identities and protected health information ("PHI") of every transgender patient who received care. *In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *3-4 & n.12 (D. Md. Jan. 21, 2026), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026).

3.     District courts across the country have condemned these identical administrative subpoenas demanding patient identities and PHI.  *See, e.g., id.* at *9 (stating that administrative subpoena to Children's National Hospital "is an overreach untethered to any lawful purpose no matter who seeks protection from the court," that "[t]he Government has made improper use of a § 3486 administrative subpoena to out Movants for receiving, and their Hospital for providing, healthcare the Executive characterizes as a 'stain on our Nation's history,'" that "[t]he Subpoena bears no credible connection to an investigation of any statutory violation by the Hospital" and that it "appears to have no purpose other than to intimidate and harass the Hospital and Movants, and those similarly situated.").

4.     Faced with rejection of its improper administrative subpoenas from courts across the country, DOJ has now decided to sidestep those orders by opening a criminal investigation. On information and belief, it has served grand jury subpoenas on several of the same medical providers previously issued administrative subpoenas. These subpoenas seek the same identifying information and PHI previously requested in the administrative

subpoenas that have been quashed by court after court as lacking any proper investigative purpose. But simply re-labeling an administrative subpoena as a grand jury subpoena cannot transform an improper investigative purpose into a proper one.

5. Plaintiffs are transgender minors and young adults who are receiving or have received pediatric transgender medical care in this District at the Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic. On information and belief, Defendant Lucile Salter Packard Children's Hospital at Stanford ("Stanford"), which operates the clinic, has received a federal grand jury subpoena seeking each Plaintiff's identifying information and PHI. Stanford's disclosure of Plaintiffs' private information in response to the grand jury subpoena – which it would be doing solely at the behest and coercion of this Administration – would render it a tool of federal law enforcement and a participant in the federal government's campaign to unconstitutionally obtain Plaintiffs' private information, which is protected by the Fourth and Fifth Amendments.

6. Production of Plaintiffs' information pursuant to the grand jury subpoena would commandeer Stanford into becoming a government agent, conveying its patients' most intimate and personally identifiable medical information to federal officials without its patients' knowledge or consent. The Constitution does not permit private medical providers from being used as instruments of the government in this manner. Government seizure of Plaintiffs' identities and PHI would violate their rights under the Fourth and Fifth Amendments, regardless of whether that seizure is accomplished directly by government officials searching their homes and doctors' offices or is instead effectuated by employing their medical providers as agents of the federal government.

7. The threatened violation of Plaintiffs' constitutional rights is imminent. The subpoena, on information and belief, has a return date no later than June 10, 2026. The Court should act quickly to exercise its jurisdiction to enjoin Stanford from becoming a participant in the violation of Plaintiffs' constitutional liberties by disclosing Plaintiffs' private medical records to federal officials.

8. At bottom, the Administration is engaged in an effort to enlist the medical

[6008648.4]

providers who deliver that care as its agents in disclosing to government officials the identities and private medical records of every individual transgender child and adolescent they treat. The records the government seeks pertain to medical care that is and was lawful where provided. And, it also is care that every major medical association recognizes as necessary care for transgender minors when medically indicated. These unlawful efforts should be halted.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

10.      An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court has authority to grant declaratory relief, injunctive relief, and other relief under both the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Court's equitable powers.

11.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) and 28 U.S.C. § 1391(c)(2). Defendant is an entity with the capacity to sue and be sued in its common name that is subject to the personal jurisdiction of this Court with respect to this action, and accordingly is deemed to reside in this district. Additionally, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

**DIVISIONAL ASSIGNMENT**

12.      Assignment to the San Jose Division of this Court is proper because this action arises in the County of Santa Clara.

**PARTIES**

**Plaintiffs**

13.      Z.A. is a 17-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2022 to the present and is proceeding in this case through parent A.A.

14.      Z.B. is a 17-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2024 to

[6008648.4]

3

COMPLAINT

2025 and is proceeding in this case through parent B.B.

15.   Z.C. is a 15-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2024 to the present and is proceeding in this case through parent C.C.

16.   Z.D. is a 10-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2021 to the present and is proceeding in this case through parent D.D.

17.   Z.E. is a 14-year-old transgender minor who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2023 to the present and is proceeding in this case through parent E.E.

18.   F.F. is a 19-year-old transgender woman who received gender-related care at Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic from 2023 to 2025.

**Defendant**

19.   Defendant Lucile Salter Packard Children's Hospital at Stanford ("Stanford") is a California nonprofit public benefit corporation with its principal place of business in Palo Alto, California. On information and belief, Stanford owns and operates the Stanford Medicine Children's Health Pediatric and Adolescent Gender Clinic.

20.   On information and belief, Stanford has received a Subpoena to Testify Before Grand Jury issued by the United States District Court for the Northern District of Texas demanding that Stanford produce documents disclosing the identities and protected health information ("PHI") of Plaintiffs and every other transgender patient to whom it provided such care— including "documents sufficient to identify each patient," diagnoses, parent/guardian information, and informed consent materials for minors.

**FACTUAL ALLEGATIONS**

21.   The Trump Administration has pledged to end pediatric transgender medical care. On January 28, 2025, the President issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," which declared it is not U.S. policy to

[6008648.4]

4

COMPLAINT

"fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care. Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3. 2025). Within days, the White House announced that the order was "already having its intended effect," listing hospitals that had paused or ended treatment.[1]

22. The United States Department of Justice ("DOJ") promptly took action. In April 2025, the Attorney General issued a memorandum, "Preventing the Mutilation of American Children," directing U.S. Attorneys to "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners," and warning DOJ would "hold accountable those who mutilate [our children] under the guise of care."[2] In June 2025, the Civil Division ordered components to "prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" providing such care to minors.[3]

23. The Administration initially pursued only civil remedies in its campaign to compel providers to stop offering this medically necessary care. On July 9, 2025, DOJ served more than 20 "substantively identical" administrative subpoenas under 18 U.S.C. § 3486 "to doctors and clinics involved in performing transgender medical procedures on children."[4] Several weeks later, the White House declared victory.[5]

---

[1] President Trump Is Delivering on His Commitment to Protect Our Kids, The White House (Feb. 3, 2025), https://www.whitehouse.gov/releases/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

[2] Memorandum for Select Component Heads: Preventing the Mutilation of American Children at 3, 5, U.S. Off. Of the Att'y Gen. (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (DOJ April 2025 Memorandum).

[3] Memorandum: Civil Division Enforcement Priorities at 2, U.S. Off. of the Assistant Att'y Gen. (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

[4] Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, Off. of Pub. Affs., U.S. Dep't of Just.. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical .

[5] President Trump Promised to End Child Sexual Mutilation—and He Delivered, The

24. Federal district courts around the country swiftly responded to DOJ's improper PHI demands. Nearly every court to consider DOJ's administrative subpoenas seeking patients' identifying information and PHI concluded that they are impermissible and must be quashed. *In re 2025 Subpoena to Children's Nat'l Hosp.,* No. 1:25-cv-03780, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (quashing subpoena for its improper purpose), *appeal docketed,* No. 26-1104 (4th Cir. Feb. 2, 2026); *In re Admin. Subpoena No. 25-1431-019,* 800 F. Supp. 3d 229, 236–39 (D. Mass. 2025) (quashing Boston Children's Hospital subpoena as issued for an improper purpose and "virtually unlimited in scope"), *appeal docketed*, No. 26-1093 (1st Cir. Jan. 30, 2026); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303–04 (W.D. Wash. 2025) (quashing subpoena for improper purpose because DOJ "issued the subpoena first and searched for a justification second"), *appeal argued*, No. 25-7384 (9th Cir. Mar. 6, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578–81, 588–607 (E.D. Pa. 2025) (striking requests to Children's Hospital of Philadelphia (CHOP) seeking patients' identities and medical data as beyond statutory authority and outweighed by minors' privacy interests); *In re Subpoena No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025) (rejecting enforcement of Seattle Children's Hospital subpoena based on "DOJ's threadbare justification …, and strong evidence suggesting that the subpoena was issued for an improper purpose"), *motion to alter or amend judgment denied*, 2026 WL 1102159 (W.D. Wash. Apr. 23, 2026); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *2–*3 (W.D. Pa. Dec. 24, 2025) (holding subpoena "tramples the Commonwealth of Pennsylvania's power to police, and legislate, matters of medical care"), *appeal docketed*, No. 26-1401 (3d Cir. Feb. 20, 2026); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, Misc. No. 25-mc-00063, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026) (report and recommendation) (concluding Children's Hospital Colorado subpoena was a "smokescreen" for ending transgender care); *In re Administrative*

White House (July 25, 2025), https://www.whitehouse.gov/releases/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

*Subpoena 25-1431-032 to Rhode Island Hospital*, No. 1:26-mc-0007-MSM-AEM, 2026 WL 1392565, at *8–10 (D.R.I. May 14, 2026) (quashing Rhode Island Hospital subpoena and collecting other decisions finding improper purpose), *appeal docketed*, No. 26-1568 (1st Cir. May 18, 2026).

25.     DOJ responded to these unfavorable court decisions by accelerating its improper efforts to obtain PHI and expanding them to include criminal grand jury proceedings. In late April 2026, DOJ filed a civil enforcement petition against Rhode Island Hospital in the Northern District of Texas, asserting that its investigation was "being carried out in the Northern District of Texas." Gov't Pet. to Enforce at 2, *In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026). Within hours— and without notice to any affected patient—the Texas district court granted the petition. Order, *id.* (N.D. Tex. Apr. 30, 2026) (ECF 2).

26.     In a parallel development, DOJ, for the first time since the start of its months-long campaign to target transgender youth and their medical providers, opened a criminal grand jury proceeding, also in the Northern District of Texas. While the nature of any alleged criminal conduct under investigation is unknown, a statement issued by NYU Langone Hospitals ("Langone") in New York City disclosed that on May 7, 2026, it "was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas."[6] The statement included a copy of the subpoena. A copy of the Langone subpoena is attached to this Complaint as **Exhibit A**. On information and belief, Stanford was one of the institutions that received a substantively identical grand jury subpoena.

27.     The grand jury subpoenas issued to Langone, and, on information and belief, to Stanford, seek patient identifying information and PHI that is substantially similar to the information sought by the administrative subpoenas previously quashed by multiple district courts as lacking any proper investigative purpose. Specifically, the following

---

[6] Information for NYU Langone Health Patients, NYU Langone Health, https://nyulangone.org/public-notices/TYHPsubpoena.

demands from the Langone subpoena directly seek identifying information and PHI:

- Subpoena specification 12 seeks "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures."

- Subpoena specification 13 seeks, for each patient so identified, "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided."

- Subpoena specification 14 seeks "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones."

28. The grand jury subpoenas issued to Langone, and, on information and belief, to Stanford, define "Sex-Rejecting Procedures" covered by the subpoenas to include "any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures."

29. The grand jury subpoenas issued to Langone, and, on information and belief, to Stanford, include a three-page "Notice Regarding Liability for Obstruction of Justice"

[6008648.4]

8

COMPLAINT

detailing potential criminal liability these institutions may face in connection with their response to the subpoenas.

30. The information sought by the grand jury subpoenas issued to Langone, and, on information and belief, to Stanford, is among the most sensitive information a medical provider can possess. Plaintiffs' Stanford records contain patient-identifying information; information revealing Plaintiffs' transgender status; diagnoses and assessments; information concerning puberty, physical development, fertility, sexuality, mental health, family dynamics, school experiences, and treatment decisions; records of communications with physicians, mental health professionals, nurses, and other providers; and records concerning parental consent and family decision-making. Those records concern children and adolescents who disclosed intimate information to medical providers and mental-health professionals for the purpose of receiving health care, with the understanding that such information would remain confidential and would not be disclosed to the federal government.

31. Plaintiffs and their parents reasonably relied on their expectation of privacy and confidentiality within the doctor-patient relationship when seeking care at Stanford. Plaintiffs disclosed information to Stanford solely for the purpose of receiving medical care, and they did so with the expectation that their information would be used for treatment and shared only with providers involved in their care.

32. Plaintiffs and their parents did not consent to Stanford's disclosure of Plaintiffs' patient-identifying medical records to the federal government, and Stanford did not provide them with notice or an opportunity to be heard before the government obtained those records. Disclosure would seriously damage Plaintiffs' trust in Stanford and in the medical system, chill Plaintiffs' willingness to seek necessary care, and deter Plaintiffs and other patients from speaking candidly with providers about sensitive information necessary for diagnosis and treatment.

33. Disclosure would also expose Plaintiffs to serious and irreparable harm. Several minor Plaintiffs are not publicly known to be transgender, and disclosure of their

[6008648.4]

9

COMPLAINT

records would risk involuntarily outing them to the government and potentially to others. The risk of harm is especially acute because the records concern minors; reveal stigmatizing and highly personal information about gender identity, medical treatment, mental health, puberty, sexuality, and family decision-making; and are sought in the context of a federal campaign that has publicly characterized the medical care Plaintiffs received as "mutilation," "child abuse," and a "warped ideology." Plaintiffs fear harassment, discrimination, family separation or prosecution, damage to education and employment opportunities, loss of access to care, and physical and emotional harm. Redaction of obvious identifiers would not eliminate these risks because the details contained in Plaintiffs' medical records—including age, dates and location of care, treatment history, providers, diagnoses, family circumstances, school information, employment information, and other contextual details—could still identify Plaintiffs and their families.

34.     By using its criminal investigation authority to compel Stanford to produce Plaintiffs' constitutionally-protected identifying information and PHI, and by raising the specter of obstruction of justice charges should Stanford fail to comply to DOJ's satisfaction, DOJ is attempting to conscript a private, third-party intermediary—Stanford—as its agent in violating the constitutional and statutory rights of Plaintiffs. There is no legitimate constitutional or investigatory purpose for disclosure of the identifying information and PHI sought by the grand jury subpoenas. The Court should issue appropriate declaratory relief and promptly enjoin Stanford from complying with the grand jury subpoenas to the extent they would require disclosure of Plaintiffs' private information.

**CLAIMS FOR RELIEF**

**COUNT I**

**United States Constitution, Amendment V**

**Denial of Due Process – Right to Informational Privacy**

35.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if

[6008648.4]

10

COMPLAINT

fully set forth herein.

36. The constitutional right to privacy encompasses the individual interest in avoiding disclosure of personal matters to the government. *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977).

37. The Ninth Circuit has expressly recognized that right and has applied it to compelled disclosures of medical information by health-care providers. *See, e.g.*, *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551–53 (9th Cir. 2004).

38. By purporting to compel production of documents sufficient to identify Plaintiffs and their PHI, the grand jury subpoena issued to Stanford seeks disclosure of information at the core of the interests protected by Plaintiffs' rights under the Fifth Amendment.

39. Plaintiffs had a well-founded and objectively reasonable expectation that this information would not be disclosed to the government absent judicial process affording Plaintiffs prior notice, an opportunity to be heard, and a particularized showing that the government's need for the specific information sought is sufficient to override Plaintiffs' constitutional privacy interest.

40. The subpoena is not limited to information relevant to any specific transaction, event, or subject matter. It is a categorical demand for years of Plaintiffs' most sensitive personal records, without disclosure of its purported relevance to any grand jury inquiry. The subpoena contains no use limitations, no restrictions on further disclosure of the information obtained, and no safeguards against dissemination of the information beyond the grand jury itself.

41. Although Stanford is a private entity, its production of Plaintiffs' information pursuant to the subpoena constitutes action under color of federal law. The subpoena is a legal command issued under the authority of a United States District Court and enforceable through its contempt power. Defendant Stanford faces legal sanctions including criminal contempt, civil contempt, and substantial monetary sanctions if it fails to comply. It retains no meaningful discretion to decline production. As such, it is a governmental actor for

[6008648.4]

11

COMPLAINT

purposes of the claims alleged in this Complaint.

42. Because the constitutional injury to Plaintiffs—the involuntary disclosure of constitutionally protected private information to the federal government—flows directly and proximately from Stanford's government-compelled act of production, that act is fairly attributable to the United States.

43. There is no legitimate governmental interest in the compelled disclosure of Plaintiffs' private information that is sufficient to override Plaintiffs' constitutional right to informational privacy. Indeed, there is no legitimate constitutional or investigative purpose for disclosure of this information whatsoever.

44. The threatened disclosure of Plaintiffs' private information constitutes an irreparable injury. Once production occurs, Plaintiffs' privacy interest in the disclosed information will be permanently destroyed. No damages award can restore the constitutional rights that will have been extinguished.

45. Plaintiffs have no adequate remedy at law. The injury Plaintiffs seek to prevent is the disclosure itself — an injury that is by its nature incapable of monetary compensation after it has occurred.

46. Plaintiffs are therefore entitled to injunctive and declaratory relief barring Stanford from producing Plaintiffs' identifying information or PHI in response to the grand jury subpoena.

**COUNT II**

**United States Constitution, Amendment IV**

**Unreasonable Search and Seizure**

47. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

48. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons

[6008648.4]

12

COMPLAINT

or things to be seized."

49. A grand jury subpoena issued to a third-party custodian of records is a form of government process that compels production of information to the federal government and constitutes a seizure of those records within the meaning of the Fourth Amendment. Although the Supreme Court held in *United States v. Miller*, 425 U.S. 435 (1976), that a person ordinarily lacks a cognizable Fourth Amendment interest in records voluntarily conveyed to a third party, the Court in *Carpenter v. United States*, 585 U.S. 296 (2018), recognized that the third-party doctrine does not apply categorically to all records held by third parties, and that its application must account for the nature, comprehensiveness, and intimacy of the information at issue.

50. *Carpenter* held that when the government compels production of a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years," the act of production implicates the Fourth Amendment notwithstanding the fact that the records are held by a third party, because the person neither truly volunteers such information nor can reasonably avoid its collection. 585 U.S. at 315, 320.

51. The identifying information and PHI subject to the subpoena is precisely the kind of comprehensive, intimate, and involuntarily conveyed information that *Carpenter* places beyond the reach of the third-party doctrine. Plaintiffs' medical records were not voluntarily disclosed to Stanford in any meaningful constitutional sense. The provision of medical care requires disclosure of private information of the most intimate sort, and federal and state law impose on providers duties of collection, retention, and documentation that Plaintiffs had no power to refuse or limit. Disclosure to a treating provider is not a free choice to expose one's medical information to the world or to the government.

52. The PHI at issue constitutes a deeply private and comprehensive record of Plaintiffs' physical and psychological condition, including diagnoses, treatments, prescriptions, mental health history, reproductive health, genetic information, and communications made in confidence to treating physicians and health professionals. This

[6008648.4]

13

COMPLAINT

information, taken in aggregate is a "detailed chronicle" of Plaintiffs' physical and mental health and medical history. The compelled production of such records to the federal government without a warrant supported by probable cause is constitutionally indistinguishable, in its degree of intrusion, from a physical search of Plaintiffs' homes or personal records. A person's complete medical history discloses the most private facts of human life — facts that the Constitution, federal and state law, and common understanding have always treated as among the most sensitive and highly protected.  Just as the cell phone records in *Carpenter* were distinguished from the bank records in *Miller* by their comprehensiveness, intimacy, and the practical impossibility of avoiding their creation, Plaintiffs' medical records are distinguished from ordinary third-party business records by all of the same characteristics. No person can receive necessary medical care without creating such records, and no person can reasonably be said to have assumed the risk of government seizure merely by seeking treatment.

53.     Stanford holds Plaintiffs' identifying information and PHI subject to express statutory and regulatory duties of confidentiality imposed by federal and state law, including the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), and its implementing regulations, 45 C.F.R. Parts 160 and 164. These duties of confidentiality reinforce Plaintiffs' reasonable expectation of privacy in the information. The government's own statutory framework recognizes that health information of this character is not freely available and is not the kind of information a person is deemed to have surrendered to federal law enforcement officials.

54.     Because Plaintiffs' identifying information and PHI held by Stanford is protected by the Fourth Amendment under the principles articulated in *Carpenter*, the federal government was required, before compelling its production, to obtain a warrant supported by probable cause, issued by a neutral and detached magistrate, and particularly describing the records to be seized.

55.     The subpoena is not a warrant. It was not issued by a neutral magistrate. It is not supported by any showing of probable cause. It does not particularly describe the

specific records to be seized, but instead demands categorical production of Plaintiffs' identifying information and PHI held by Stanford across a period of more than five years. It therefore does not satisfy the requirements of the Fourth Amendment's Warrant Clause.

56. Not only does the subpoena fail to comply with the Warrant Clause, it is also constitutionally unreasonable. It is unlimited in scope, unsupported by any particularized showing of relevance or need, directed at the most sensitive categories of personal information, and issued without any procedural mechanism affording Plaintiffs notice or an opportunity to be heard before the search is effected.

57. Although Stanford is a private entity, its production of Plaintiffs' information pursuant to the subpoena constitutes action under color of federal law. The subpoena is a legal command issued under the authority of a United States District Court and enforceable through its contempt power. Defendant Stanford faces legal sanctions including criminal contempt, civil contempt, and substantial monetary sanctions if it fails to comply. It retains no meaningful discretion to decline production. As such, it is a governmental actor for purposes of the claims alleged in this Complaint.

58. In the alternative, Stanford's act of producing Plaintiffs' health records to the federal government, in response to a constitutionally defective subpoena and without interposing any challenge on Plaintiffs' behalf, constitutes an unreasonable search and seizure of Plaintiffs' private records and information effected through private hands under government compulsion, in violation of the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989) (private party conducting search at government direction is state actor for Fourth Amendment purposes).

59. At all relevant times, Plaintiffs had and have a subjectively manifested and objectively reasonable expectation of privacy in the identifying information and PHI at issue. Plaintiffs disclosed this information to Stanford solely for the purpose of receiving medical care, under conditions of legally-protected professional confidentiality, and did not thereby assume any risk that the information would be seized and produced to the federal government in bulk, without notice, without a warrant, and without a particularized

[6008648.4]

15

COMPLAINT

showing of need.

60. The compelled production of Plaintiffs' identifying information and PHI pursuant to the subpoena, absent a warrant supported by probable cause and particularly describing the records to be produced, violates Plaintiffs' rights under the Fourth Amendment.

61. As a direct and proximate result of this violation, Plaintiffs suffer and will continue to suffer irreparable injury—the permanent and irremediable destruction of Plaintiffs' privacy interest in the most intimate details of their physical and mental health and medical history. This injury is not compensable in damages and entitles Plaintiffs to injunctive and declaratory relief.

62. Plaintiffs are therefore entitled to injunctive and declaratory relief barring Stanford from producing Plaintiffs' identifying information or PHI in response to the grand jury subpoena, absent the government's obtaining a valid warrant issued by a detached and neutral magistrate upon probable cause, supported by oath or affirmation, and particularly describing the records to be seized.

## COUNT III

### United States Constitution, Amendment V

### Denial of Equal Protection of the Laws

63. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

64. The Fifth Amendment's Due Process Clause prohibits the federal government from denying any person the equal protection of the laws. The constitutional guarantee of equal protection applies with full force to federal action, including federal investigative process directed at individuals on the basis of protected characteristics.

65. The identifying information and PHI subject to the subpoena relate specifically and exclusively to Plaintiffs' receipt of transgender medical care, including hormone therapy, puberty delaying medications, voice modification, mental health treatment, and any other treatments that are "functionally integral to, preparatory for, or

undertaken in furtherance of" medical care undertaken "for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex." The subpoena does not seek Plaintiffs' health records generally; it targets records pertaining specifically to transgender medical care.

66. The subpoena thus singles out Plaintiffs for compelled government disclosure of private medical information because they are transgender and have lawfully exercised their right to obtain medically necessary care that enables them to live consistently with their transgender identity.

67. Government action that subjects individuals to differential treatment because they are transgender, or because they have obtained medical care associated with transgender identity, is sex-based discrimination subject to heightened scrutiny under the equal protection component of the Fifth Amendment.

68. Additionally, government action that subjects individuals to differential treatment because they are transgender, or because they have obtained medical care associated with transgender identity, constitutes discrimination against a quasi-suspect class that is subject to heightened scrutiny independent of the sex-discrimination framework. *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019).

69. The subpoena is not a facially neutral instrument of general law enforcement applied without regard to the identity of its targets. It is directed specifically at records of transgender medical care received by Plaintiffs. In targeting this specific category of medical treatment — treatment that is received exclusively or primarily by transgender individuals — the subpoena classifies on the basis of transgender status and thus on the basis of sex.

70. The subpoena was issued as part of an expressly-declared nationwide policy by the Trump Administration to target individuals who have received, provided, or facilitated access to pediatric transgender medical care. On information and belief, the government has not issued comparable subpoenas broadly seeking the private medical records of non-transgender individuals who have received identical or similar medical

treatments — including hormone therapies, surgeries affecting sex characteristics, or mental health treatment.

71.     The government's selective targeting of medical records associated with transgender medical care, while not seeking comparable records associated with analogous medical treatment received by non-transgender individuals, constitutes facial, purposeful discrimination on the basis of sex and transgender status in violation of the equal protection component of the Fifth Amendment.

72.     Government action that discriminates based on sex or another quasi-suspect basis is subject to heightened scrutiny; in order to survive such scrutiny, it must be substantially related to an important government interest. *United States v. Virginia*, 518 U.S. 515, 533 (1996). To the extent strict scrutiny applies the government's action must be narrowly tailored to serve a compelling government interest. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

73.     The subpoena cannot survive any level of equal protection scrutiny. The government has articulated no legitimate investigative purpose that is served by compelling disclosure of Plaintiffs' private records that would not be equally served by means do not require wholesale seizure of Plaintiffs' most private medical information. Even if there were a legitimate government interest in the subject matter of the underlying investigation, the targeting of Plaintiffs' identities and PHI relating to their transgender medical care is not substantially related — let alone narrowly tailored — to that interest, because the government has made no showing that Plaintiffs' records are necessary or material to any legitimate investigative purpose.

74.     The subpoena's targeting of transgender individuals' records reflects and perpetuates the Administration's repeatedly articulated view that transgender medical care is inherently suspect, immoral, or subject to special government scrutiny. It therefore is explicitly premised on constitutionally impermissible animus against transgender individuals. Government action motivated by animus toward a particular group cannot survive any level of heightened scrutiny. *United States v. Windsor*, 570 U.S. 744, 769–70

[6008648.4]

18

COMPLAINT

(2013); *Romer v. Evans*, 517 U.S. 620, 632 (1996).

75. The targeting of records of transgender medical care also burdens Plaintiffs' exercise of constitutionally protected liberty interests — including the right to make intimate medical decisions, the right to bodily autonomy recognized in *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), and the right to define one's own identity and intimate life recognized in *Lawrence v. Texas*, 539 U.S. 558 (2003) and *Obergefell v. Hodges*, 576 U.S. 644 (2015) — which independently require that any government burden on those interests be narrowly tailored to a compelling interest.

76. The discriminatory purpose and effect of the subpoena is independently established by the pattern of government action of which it is a part. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) (discriminatory purpose may be established by circumstantial and direct evidence including departures from normal procedural sequences, historical background, and legislative or administrative history). The government's broader pattern of targeting transgender individuals and providers, recipients, and facilitators of transgender medical care through law enforcement and investigative process establishes that the targeting of Plaintiffs' records is not coincidental or neutral but reflects a deliberate policy of subjecting transgender individuals and their healthcare providers to heightened government surveillance and investigation.

77. Although Stanford is a private entity, its production of Plaintiffs' information pursuant to the subpoena constitutes action under color of federal law. The subpoena is a legal command issued under the authority of a United States District Court and enforceable through its contempt power. Defendant Stanford faces legal sanctions including criminal contempt, civil contempt, and substantial monetary sanctions if it fails to comply. It retains no meaningful discretion to decline production. As such, it is a governmental actor for purposes of the claims alleged in this Complaint.

78. Plaintiffs will suffer irreparable injury if Stanford produces the targeted identifying information and PHI. The compelled disclosure to the federal government of

records specifically identified as records of transgender medical care — pursuant to a discriminatorily motivated subpoena and without any lawful justification — inflicts harm on Plaintiffs, chills their exercise of their constitutional rights, and permanently destroys Plaintiffs' privacy interest in information that the government has targeted for disclosure precisely because Plaintiffs are transgender. These injuries are not compensable in damages.

79. Plaintiffs are therefore entitled to injunctive and declaratory relief barring Stanford from producing Plaintiffs' identifying information or PHI in response to the grand jury subpoena.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendant Stanford, and grant the following relief:

1. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Stanford and all persons acting in concert with it or on its behalf, from producing, transmitting, disclosing, or otherwise making available to the United States, the Department of Justice, the grand jury sitting in the United States District Court for the Northern District of Texas, or any agent or representative of any of these entities, any records, documents, or information responsive, on information and belief, to specifications 12-14 of the grand jury subpoena, or otherwise providing Plaintiffs' identifying information or protected health information to any of these persons or entities;

2. A temporary restraining order, preliminary injunction, and permanent injunction maintaining the status quo with respect to all records and information responsive to the grand jury subpoena that contain Plaintiffs' identifying information or protected health information, including by requiring Stanford to preserve all such records in their current form and to refrain from altering, destroying, or transferring them to any party.

3. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57:

a. Declaring that Plaintiffs have a constitutionally protected right to informational privacy under the Fifth Amendment in the identifying information and protected health information subject to the grand jury subpoena, and that compelled disclosure of such information to the federal government necessity violates that right;

b. Declaring that Plaintiffs have a reasonable expectation of privacy protected by the Fourth Amendment in the identifying information and protected health information subject to the grand jury subpoena and that the government is required to obtain a warrant issued by a detached and neutral magistrate upon probable cause, supported by oath or affirmation, and particularly describing the records to be seized before compelling their production;

c. Declaring that the grand jury subpoena, as issued and as applied to Plaintiffs' identifying information and protected health information relating to transgender medical care, constitutes discrimination on the basis of sex and transgender status in violation of the equal protection component of the Fifth Amendment's Due Process Clause and has no lawful justification that survives constitutional scrutiny;

d. Declaring that Stanford's production of Plaintiffs' records responsive to the grand jury subpoena, under government compulsion, would constitute action under color of federal law fairly attributable to the United States, and would render Stanford a state actor and participant in the constitutional violations alleged herein; and

e. Declaring that any records or information obtained by the United States through enforcement of the grand jury subpoena, or through any alternative process issued in furtherance of the same discriminatorily motivated investigative program, may not be used in any criminal, civil, or administrative proceeding against Plaintiffs or

[6008648.4]

21

COMPLAINT

any third party who provided or participated in Plaintiffs' transgender medical care;

4.      Award Plaintiff reasonable attorneys' fees and litigation costs.

5.      Grant such other and further relief as this Court deems just, equitable, and proper, including any relief necessary to remedy the constitutional violations alleged herein and to prevent their recurrence.

DATED:  May 27, 2026                    Respectfully submitted,

NATIONAL CENTER FOR LGBTQ RIGHTS
GLBTQ LEGAL ADVOCATES & DEFENDERS
(GLAD LAW)
ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Kara J. Janssen*
         Kara J. Janssen

Attorneys for Plaintiffs

[6008648.4]

22

COMPLAINT

# Exhibit A

.AO110  (Rev. 12/89) Subpoena to Testify Before Grand Jury

# UNITED STATES DISTRICT COURT

## Northern District of Texas

TO:

NYU Langone Hospitals

Attn: Custodian of Records

530 First Avenue
HCC-15
New York, NY 10016

**SUBPOENA TO TESTIFY
BEFORE GRAND JURY**

SUBPOENA FOR:

☐ PERSON    ☑ DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| 501 W 10th St.<br>Fort Worth, TX 76102-6882 | Grand Jury Room |
| | DATE AND TIME<br>6/10/2026        9:00 am |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

PLEASE SEE ATTACHMENT

☐  *Please see additional information on reverse.*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| *Karen Mitchell*<br>(By) Deputy Clerk | 5/6/2026 |

| This subpoena is issued on application of the United States of America | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY<br>Ethan Womble<br>Assistant United States Attorney<br>801 Cherry St., Suite 1700<br>Fort Worth, TX 76102-6882<br>(817) 252-5200 |
|---|---|

* If not applicable, enter "none".

R26 TXN  53130

AO110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

| RETURN OF SERVICE (1) | | |
|---|---|---|
| **RECEIVED BY SERVER** | DATE | PLACE |
| **SERVED** | DATE | PLACE |

SERVED ON (PRINT NAME)

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL 0.00 |

## DECLARATION OF SERVER (2)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

ADDITIONAL INFORMATION

(1) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.

(2) "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)".

**Print**     **Save As...**     **Reset**

## ATTACHMENT A

**ATTACHMENT TO THE GRAND JURY SUBPOENA ISSUED TO**

NYU Langone Hospitals
530 First Avenue
HCC-15
New York, NY 10016

### I.  DEFINITIONS

1.    "You," "Your Company," and "the Company" means:

  a.    NYU Langone Hospitals, a New York nonprofit corporation, whose principal place of business is located at 430 East 34th Street, New York, New York, without regard to any name under which it has done business;

  b.    All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Transgender Youth Health Program at Hassenfeld Children's Hospital at NYU Langone; and

  c.    Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2.    "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.    "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

  a.    All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

  b.    Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes,

1

telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c. Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d. Any electronic files saved as a backup, including metadata;

e. Any deleted but recoverable electronic files, including metadata;

f. Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g. Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h. All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4. "Relevant Time Period" means **January 1, 2020, through May 5, 2026**. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5. "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6. "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7. "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8. "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any

2

records or logs reflecting the time, date, participants, and content of such communications.

9.      "Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures. An intervention or treatment is considered a Sex-Rejecting Procedure based on its intended purpose and expected physiological or functional effect, and not on the terminology or classification used by a health care provider or facility.

10.     "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11.     "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics. This includes hormone-blocking drugs, such as spironolactone, used to suppress naturally-occurring hormones for the facilitation of GAHT.

12.     "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II.  DOCUMENTS TO BE PRODUCED

For the Relevant Time Period, please provide in electronic format:

1.      Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories:  (a) those who held authority to perform or order Sex-Rejecting Procedures; (b) those who conducted clinical evaluations related to Sex-Rejecting Procedures; (c) those who engaged in billing or coding activities related to Sex-Rejecting Procedures; and (d) any individual within such person's supervisory or reporting chain.

2.      All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving Sex-Rejecting Procedures.

3.      All documents that show or relate to any use of diagnosis codes for minors undergoing Sex-Rejecting Procedures other than codes specifically identifying

3

transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, vocal disorders, medication management, etc.).

4.  All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for Sex-Rejecting Procedures.

5.  All communications with public or private health care benefit programs or plans regarding the use of ICD codes for Sex-Rejecting Procedures, including any inquiries, denials, or appeals related to claims for such procedures or treatment.

6.  Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for Sex-Rejecting Procedures.

7.  All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in Sex-Rejecting Procedures for minors.

8.  All documents relating to communications between any pharmaceutical manufacturer of puberty blockers or hormones and any of the individuals identified in response to specification 1, *supra*, regardless of whether the document or communication is facially related to Sex-Rejecting Procedures for minors.

9.  All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for use in or associated with Sex-Rejecting Procedures or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

10. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for Sex-Rejecting Procedures or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

11. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

12. Documents sufficient to identify each patient who underwent Sex-Rejecting Procedures.

13. For each such patient identified in Subpoena specification 12, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided

4

to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided.

14. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.,* uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones.

15. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety and effectiveness of Sex-Rejecting Procedures for treatment of gender dysphoria, including the use of puberty blockers or hormones.

16. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to Sex-Rejecting Procedures.

17. All communications with the World Professional Association for Transgender Health ("WPATH") or any of its members relating to Sex-Rejecting Procedures, including but not limited to communications regarding the safety and efficacy or Sex-Rejecting Procedures, the Standards of Care 8, and billing guidance for Sex-Rejecting Procedures

## III. FORM OF PRODUCTION

We request materials responsive to the above be made available in electronic format. Please forward the documents directly to the individual listed below on or before the return date of this subpoena:

**Special Agent Bradley Cooper**
**FDA Office of Criminal Investigations**
**Kansas City Field Office**
**(913) 396-2129**
**bradley.cooper@fda.hhs.gov**

## HIPAA STATEMENT

The U.S. Department of Justice (the "DOJ") is familiar with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the regulations providing guidance in the application of that statute.

The DOJ has considered the predicate requirements of 45 C.F.R., § 164.512 (f)(1(ii)(C)(1)-(3) and represents that

- The information requested in this grand jury subpoena attachment is relevant and material to a legitimate law enforcement inquiry;
    - The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and
    - De-identified information could not reasonably be used in its stead.

The documents and records requested in this grand jury subpoena attachment requires you to produce are sought by the DOJ in its capacity as a health oversight agency, and this information is necessary to further health oversight activities. *See* 45 C.F.R. §§ 164.512(d) and 164.501. The information sought is the minimum necessary to accomplish the intended purpose of the subpoena. *See* 45 C.F.R. § 164.502(b)(1).

## PRIVILEGE LOG

This grand jury subpoena is not intended to call for the production of any material that is subject to a valid claim of attorney-client or other privilege recognized by the federal courts of the United States. To the extent you or some other party may seek to assert a claim of privilege, work product protection, or other legal claim to preclude production of material called for in this subpoena, a privilege log must be produced. Such a privilege log shall set forth:

a. each document by date, transmittal detail (if any);
b. type of document;
c. author(s) and location (e.g., name of company, firm etc.);
d. recipient(s) and location (e.g., name of company, firm etc.);
e. general subject matter;
f. number of pages;
g. paragraph of the subpoena to which the document is responsive;
h. indicated or known circulation, including the names and titles of all persons to whom the document, or a copy thereof, or any part thereof, was shown; and
i. the privilege asserted with respect to each such document in sufficient detail to facilitate a determination by a reviewing party or court to assess the validity of the claim of privilege.

Failure to produce such a log with sufficient detail to allow a reviewing party or court to assess whether such a claim is valid may result in waiver of any such claim.

6

## NOTICE REGARDING LIABILITY FOR OBSTRUCTION OF JUSTICE

- **18 U.S.C. § 1001 in relevant part provides –**

  (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
  > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
  > (2) makes any materially false, fictitious, or fraudulent statement or representation; or
  > (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

  shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

- **18 U.S.C. § 1503 in relevant part provides –**

  (a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

- **18 U.S.C. § 1512 in relevant part provides –**

  (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

7

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

. . .

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

- **18 U.S.C. § 1519 provides –**

  Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

- **18 U.S.C. § 1623(a) in relevant part provides –**

  (a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

Pursuant to Federal Rules of Evidence 803(6) and 902(11) regarding certified domestic records of regularly conducted activity, I hereby certify:

1. I am employed by _____ ("the Business") and my official title is _____. I am a person designated by the Business as a custodian of records with the authority to make this certificate.

2. I state that each of the records attached hereto is the original record, or a true duplicate of the original record, in the custody of the Business, and that I am the custodian of the attached records, consisting of _____ total pages.

3. I further certify that all records attached to this certificate were made at or near the time of the occurrence of the matters set forth, by or from information transmitted by, a person with knowledge of those matters.

4. I further certify that that all records attached to this certificate were kept in the course of the regularly conducted activity of the Business.

5. I further certify that it is the regular practice of the Business to make and retain each record attached to this certificate.

6. I further state that this certificate is intended to satisfy the requirements of Rule 902(11) of the FEDERAL RULES OF EVIDENCE.

   Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Date: _____                    _____
                                             Signature


                                             _____
                                             Print Name