SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California  94102
Telephone:   (415) 392-6257
Email:        sminter@nclrights.org
              cstoll@nclrights.org
              awhelan@nclrights.org
              rberg@nclrights.org

JOSHUA ROVENGER*
DONOVAN BENDANA*
GLBTQ LEGAL ADVOCATES &
DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts  02108
Telephone:   (617) 426-1350
Email:        jrovenger@gladlaw.org
              dbendana@gladlaw.org

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:        ggrunfeld@rbgg.com
              kjanssen@rbgg.com

*motion for admission *pro hac vice* forthcoming

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| Z.A., a minor, by and through their parent, A.A.; Z.B., a minor, by and through their parent, B.B.; Z.C., a minor, by and through their parent, C.C.; Z.D., a minor, by and through their parent, D.D.; Z.E., a minor, by and through their parent, E.E.; and F.F.,<br><br>Plaintiffs,<br><br>v.<br><br>LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, a California nonprofit public benefit corporation,<br><br>Defendant. | Case No. 5:26-cv-04998<br><br>**PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**RELIEF REQUESTED BY 5:00 P.M., JUNE 9, 2026**<br><br>Trial Date:        None Set |

[6009345.2] []

Case No. 5:26-cv-04998
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................................1

I.    INTRODUCTION .................................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................................2

    A.    THE TRUMP ADMINISTRATION EMBARKS ON AN EFFORT TO END PEDIATRIC TRANSGENDER MEDICAL CARE...........................................................2

    B.    AS PART OF THAT CAMPAIGN, THE ADMINISTRATION ISSUES MORE THAN 20 SUBSTANTIVELY IDENTICAL ADMINISTRATIVE SUBPOENAS SEEKING THE SAME PHI AT ISSUE HERE ...................................3

    C.    REBUFFED BY COURTS ON THEIR ADMINISTRATIVE SUBPOENAS, DOJ PIVOTS TO GRAND JURY SUBPOENAS SEEKING THE SAME PHI ...........5

III.  LEGAL STANDARD.............................................................................................................6

IV.   ARGUMENT .........................................................................................................................7

    A.    THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE REQUESTED RELIEF ..............................................................................................7

        1.    Plaintiffs Have Article III Standing to Seek Injunctive Relief Against Stanford. ........................................................................................................7

        2.    This Court May Adjudicate Plaintiffs' Constitutional Challenge to Stanford's Compliance with an Out-of-District Grand Jury Subpoena...............7

        3.    The Grand Jury Context Does Not Immunize the Subpoena from Constitutional Challenge. ..........................................................................9

    B.    BECAUSE STANFORD'S COMPLIANCE WITH THE FEDERAL SUBPOENA IS FAIRLY ATTRIBUTABLE TO THE GOVERNMENT, THIS COURT MAY ENJOIN DISCLOSURE THAT WOULD VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS .............................................................10

    C.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT STANFORD'S DISCLOSURE OF THEIR IDENTIFYING INFORMATION AND PHI WOULD VIOLATE THEIR RIGHT TO INFORMATIONAL PRIVACY ........................................................................................................13

        1.    The Type of Information Requested Is Among the Most Sensitive Medical Information a Provider Can Hold..........................................................14

        2.    Nonconsensual Disclosure Would Cause Grave Harm....................................15

        3.    There Are No Adequate Safeguards Against Unauthorized Disclosure or Misuse..........................................................................................17

        4.    The Government Has No Demonstrated Need for Plaintiffs' Identities or PHI.............................................................................................18

        5.    No Statutory Mandate, Public Policy, or Recognizable Public Interest Justifies Disclosure of Plaintiffs' Identifying Information and PHI. ...............21

D.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ........................................................................................................22

E.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PRELIMINARY RELIEF................................................24

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

# TABLE OF AUTHORITIES

**Page**

<u>**CASES**</u>

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)......................................................................................... 7

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ....................................................................................................... 11

*Blum v. Yaretsky*,
457 U.S. 991 (1982)...................................................................................................... 11

*Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*,
827 F.2d 1291 (9th Cir. 1987)................................................................................. 11, 12

*Children's Health Def. v. Meta Platforms, Inc.*,
112 F.4th 742 (9th Cir. 2024) ...................................................................................... 11

*Clear Channel Outdoor, Inc. v. City of Los Angeles*,
340 F.3d 810 (9th Cir. 2003)......................................................................................... 7

*D.T. v. Christ*,
552 F. Supp. 3d 888 (D. Ariz. 2021).............................................................................. 15

*Dobbs v. Jackson Women's Health Organization.*
597 U.S. 215 (2022)...................................................................................................... 13

*Doe v. Bonta*,
101 F.4th 633 (9th Cir. 2024)........................................................................................ 14

*Doe v. Garland*,
17 F.4th 941 (9th Cir. 2021).......................................................................................... 14

*Elrod v. Burns*,
427 U.S. 347 (1976) .................................................................................................. 7, 23

*Endy v. Cnty. of Los Angeles*,
975 F.3d 757 (9th Cir. 2020).......................................................................................... 13

*Hale v. Henkel*,
201 U.S. 43 (1906) ........................................................................................................ 9

*In re 2025 Children's Hosp. of L.A. Subpoena*,
No. 2:25-cv-11183 (C.D. Cal. Jan. 22, 2026) ................................................................ 20

*In re 2025 Subpoena to Children's Nat'l Hosp.*,
No. 1:25-cv-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026)............................. 3, 14, 19, 22

*In re 2025 UPMC Subpoena*,
No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) ............................ 4, 19, 20

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*In re 2025 UPMC Subpoena*,
   No. 26-1401 (3d Cir. Feb. 20, 2026)..................................................................................... 4

*In re Admin. Subpoena 25-1431-032 to R.I. Hosp*,
   _ F. Supp. 3d. _, 2026 WL 1392565 ..................................................................................... 5

*In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*,
   No. 1:26-mc-00007 (D.R.I. May 7, 2026) ...................................................................... passim

*In re Admin. Subpoena 25-1431-032*,
   No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026) ..................................................................... 5

*In re Admin. Subpoena No. 25-1431-019*,
   800 F. Supp. 3d 229 (D. Mass. 2025) ................................................................................... 3

*In re CNH Subpoena*,
   No. 1:25-cv-03780 (D. Md. Nov. 17, 2025) .......................................................................... 3

*In re Crawford*,
   194 F.3d 954 (9th Cir. 1999)........................................................................................... 13, 15

*In re Grand Jury Proceeding*,
   721 F.2d 1221 (9th Cir. 1983)............................................................................................... 9

*In re Grand Jury Subpoena, JK-15-029*,
   828 F.3d 1083 (9th Cir. 2016)............................................................................................... 9

*In re Subpoena Duces Tecum No. 25-1431-016*,
   No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) ................................ 4, 19

*In re Subpoena Duces Tecum No. 25-1431-016*,
   2026 WL 1102159 (W.D. Wash. Apr. 23, 2026)....................................................................... 4

*In re Subpoena No. 25-1431-014*,
   810 F. Supp. 3d 555 (E.D. Pa. 2025) ............................................................................. passim

*Khalil v. Trs. of Columbia Univ. in City of New York*,
   No. 25-CV-2079, 2026 WL 775813 (S.D.N.Y. Mar. 19, 2026) ............................................ 12

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).............................................................................................................. 7

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012)........................................................................................ 7, 23, 24

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)............................................................................................................ 11

*New York Times Co. v. Gonzales*,
   459 F.3d 160 (2d Cir. 2006)................................................................................................... 8

*Nw. Mem'l Hosp. v. Ashcroft*,
   362 F.3d 923 (7th Cir. 2004).......................................................................................... 10, 16, 20

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ............................................................................................. 11

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*Peterson v. City of Greenville*,
 373 U.S. 244 (1963).................................................................................................. 12

*Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*,
 No. C03-4872, 2004 WL 432222 (N.D. Cal. Mar. 5, 2004)................................................. 16

*Planned Parenthood of S. Ariz. v. Lawall*,
 307 F.3d 783 (9th Cir. 2002)....................................................................... 14, 17, 18

*Powell v. Schriver*,
 175 F.3d 107 (2d Cir. 1999)........................................................................................ 15

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
 807 F. Supp. 3d 1295 (W.D. Wash. 2025)........................................................ 3, 9, 22

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
 No. 25-7384 (9th Cir. Mar. 6, 2026).................................................................. 3

*Sammartano v. First Judicial Dist. Ct.*,
 303 F.3d 959 (9th Cir. 2002)....................................................................................... 24

*See Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014).................................................................................................... 7

*Skinner v. Railway Labor Executives' Association*,
 489 U.S. 602 (1989).................................................................................................. 10

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*,
 240 F.3d 832 (9th Cir. 2001)..................................................................................... 6

*Tucson Woman's Clinic v. Eden*,
 379 F.3d 531 (9th Cir. 2004)............................................................................. passim

*United States v. Calandra*,
 414 U.S. 338 (1974)..................................................................................................... 9

*United States v. R. Enterprises, Inc.*,
 498 U.S. 292 (1991)..................................................................................................... 9

*Whalen v. Roe*,
 429 U.S. 589 (1977).................................................................................................. 13

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)......................................................................................................... 6

**OTHER AUTHORITIES**

Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender
 Medical Procedures on Children, Off. of Pub. Affs., U.S. Dep't of Just.. (July 9, 2025).... 4, 19

Email from Ross Goldstein, U.S. Dep't of Just., to Eve Hill (Nov. 14, 2025) ..................................... 4

Memorandum for Select Component Heads re Preventing the Mutilation of American
 Children, Off. Att'y Gen. at 3-4, 5 (Apr. 22, 2025)........................................................... 4, 19

Memorandum for Select Component Heads: Preventing the Mutilation of American Children
U.S. Off. Of the Att'y Gen. (Apr. 22, 2025) ................................................................. 4

Memorandum: Civil Division Enforcement Priorities at 2, U.S. Off. of the Assistant Att'y
Gen. (June 11, 2025) ...................................................................................................... 4

President Trump Is Delivering on His Commitment to Protect Our Kids, The White House
(Feb. 3, 2025) ................................................................................................................. 3

President Trump Promised to End Child Sexual Mutilation—and He Delivered, The White
House (July 25, 2025) ..................................................................................................... 4

**RULES**

Fed. R. Crim. P. 17 ................................................................................................................ 13

Fed. R. Crim. P. 6 .................................................................................................................. 19

**REGULATIONS**

45 C.F.R. § 164.512 .............................................................................................................. 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Since January 2025, the federal government has leveraged the weight of its power to target essential medical care for transgender minors. As part of this effort, the Department of Justice ("DOJ") served substantively identical administrative subpoenas on health care providers across the country, trying to compel hospitals and providers across the country to disclose the identities and protected health information ("PHI") of transgender minors and young adults who received lawful medical care. Courts reviewing those earlier administrative subpoenas have nearly-unanimously rejected those efforts as untethered to any legitimate investigative need, as an impermissible intrusion on patients' privacy, and as designed for no purpose other than to intimidate and harass hospitals, patients, and providers.

In the face of these court orders precluding the use of administrative subpoenas, DOJ is now seeking this same information, but under a different name. It obtained grand jury subpoenas issued from the Northern District of Texas that seek identical, private material. These grand jury subpoenas, like their administrative precursors, are part of the same federal effort that court after court has found illegitimate. And, like the other subpoenas, these would also trample on individuals' privacy interests.

On information and belief, DOJ has issued one such subpoena to Stanford. The subpoena is, in every sense of the word, compulsory. It forces Stanford to transmit the Plaintiffs' intimate and personally identifying information to the government, all under the threat of contempt and possible criminal sanctions. By leaving Stanford with no choice but to turn over patients' private health information, the government is commandeering Stanford into becoming an agent of its unlawful efforts to obtain medical information without patients' knowledge or consent.

Plaintiffs—transgender minors and young adults who are or have received pediatric transgender medical care in this District at the Stanford Medicine Children's Health Pediatric & Adolescent Gender Clinic—bring this action against Stanford to prevent it from unconstitutionally disclosing their information to the government. They seek narrow, emergency relief aimed at halting the unlawful conduct: the transfer of their medical records from Stanford to the government. The requested order would not bar any lawful investigation or impede on the work of the grand jury;

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

instead, it would prevent Stanford—the custodian of the records, and a private medical provider that is being used as an instrument of government—from irreversibly disclosing Plaintiffs' identities and protected health information while this Court considers whether the compelled disclosure of their most sensitive medical records would violate the Constitution. Because disclosure would immediately and irreparably harm Plaintiffs' constitutional rights, this Court should provide this urgently needed relief.

## II.      STATEMENT OF FACTS

### A.      THE TRUMP ADMINISTRATION EMBARKS ON AN EFFORT TO END PEDIATRIC TRANSGENDER MEDICAL CARE

The Trump Administration has pledged to end pediatric transgender medical care. On January 28, 2025, the President issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," which declared "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care. Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025). Within days, the White House announced that the order was "already having its intended effect," listing hospitals that had paused or ended treatment.[1]

The United States Department of Justice ("DOJ") promptly took action to effectuate this mandate. In April 2025, the Attorney General issued a memorandum, "Preventing the Mutilation of American Children," directing U.S. Attorneys to "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners," and warning DOJ would "hold accountable those who mutilate [our children] under the guise of care."[2] In June 2025, the Civil Division ordered components to "prioritize investigations of doctors, hospitals, pharmaceutical

---

[1] President Trump Is Delivering on His Commitment to Protect Our Kids, The White House (Feb. 3, 2025), https://www.whitehouse.gov/releases/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

[2] Memorandum for Select Component Heads: Preventing the Mutilation of American Children at 3, 5, U.S. Off. Of the Att'y Gen. (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (DOJ April 2025 Memorandum).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

companies, and other appropriate entities" providing such care to minors.[3]

### B.    AS PART OF THAT CAMPAIGN, THE ADMINISTRATION ISSUES MORE THAN 20 SUBSTANTIVELY IDENTICAL ADMINISTRATIVE SUBPOENAS SEEKING THE SAME PHI AT ISSUE HERE

The Administration initially pursued only civil investigations in its campaign to compel providers to stop offering this medically necessary care. DOJ served more than 20 "substantively identical" administrative subpoenas under 18 U.S.C. § 3486 "to doctors and clinics involved in performing transgender medical procedures on children."[4] Several weeks later, the White House declared victory.[5]

Federal district courts around the country swiftly halted many of DOJ's improper PHI demands, quashing the administrative subpoenas seeking patients' identifying information and PHI. *In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (quashing subpoena for improper purpose); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236–39 (D. Mass. 2025) (quashing Boston Children's Hospital subpoena as issued for an improper purpose and "virtually unlimited in scope"), *appeal docketed*, No. 26-1093 (1st Cir. Jan. 30, 2026); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303–04 (W.D. Wash. 2025) (quashing subpoena for improper purpose because DOJ "issued the subpoena first and searched for a justification second"), *appeal argued*, No. 25-7384 (9th Cir. Mar. 6, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578–81, 588–607 (E.D. Pa. 2025) (striking requests to Children's Hospital of Philadelphia ("CHOP") seeking patients' identities and medical

---

[3] Memorandum: Civil Division Enforcement Priorities at 2, U.S. Off. of the Assistant Att'y Gen. (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl.

[4] Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, Off. of Pub. Affs., U.S. Dep't of Just.. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical. *See also In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *3 n.12 (D. Md. Jan. 21, 2026) (*In re CNH Subpoena*), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026). *See also* Email from Ross Goldstein, U.S. Dep't of Just., to Eve Hill (Nov. 14, 2025), Mot. to Quash Ex. W, *In re CNH Subpoena*, No. 1:25-cv-03780 (D. Md. Nov. 17, 2025) (ECF 1-38).

[5] President Trump Promised to End Child Sexual Mutilation—and He Delivered, The White House (July 25, 2025), https://www.whitehouse.gov/releases/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

data as beyond statutory authority and outweighed by minors' privacy interests); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025) (rejecting enforcement of Seattle Children's Hospital subpoena based on "DOJ's threadbare justification . . . , and strong evidence suggesting that the subpoena was issued for an improper purpose"), *motion to alter or amend judgment denied*, 2026 WL 1102159 (W.D. Wash. Apr. 23, 2026); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *2–*3 (W.D. Pa. Dec. 24, 2025) (granting patient movants' request for relief), *appeal docketed*, *In re 2025 UPMC Subpoena* No. 26-1401 (3d Cir. Feb. 20, 2026); *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, _ F. Supp. 3d _, 2026 WL 1392565, at *8–*10 (D.R.I. May 14, 2026) (quashing Rhode Island Hospital subpoena and collecting other decisions finding improper purpose), *appeal docketed*, No. 26-1568 (1st Cir. May 18, 2026).

These decisions did not rest on technical defects unique to any one subpoena recipient. Instead, they identified the same core defects present here: DOJ's asserted FDCA and fraud investigative rationale is disconnected from demands for patient-identifying medical records; the demands sweep in children's intimate medical, psychological, and family information; and the subpoenas appear designed to advance the Administration's stated objective of ending transgender medical care rather than to investigate any specific unlawful conduct. *See In re Subpoena Duces Tecum No. 25-1431-016*, 2026 WL 1102159, at *2 (denying motion to amend or alter judgment and noting that "seven recent decisions from other courts considering virtually identical subpoenas" had reached similar conclusions).

The subpoena campaign is likewise not the product of district-specific inquiries. In related proceedings, DOJ itself described the Northern District of Texas as "the venue where this nationwide investigation . . . is being conducted," even as courts in the districts where the subpoenas were served rejected DOJ's effort to recast that distant forum as the primary venue for disputes over affected patients' records. Mot. to Stay or for Transfer of Venue at 3, *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007 (D.R.I. May 7, 2026) (ECF 8); Text Order on Gov't Mot. to Stay or for Transfer of Venue, *id.* (D.R.I. May 7, 2026). That centrally directed pattern matters here because Stanford's subpoena is alleged to be substantively identical to the subpoenas already rejected when

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

previously used to obtain patient identities and PHI. *See, e.g., id.* (denying motion to transfer venue in Rhode Island Child Advocate case in Rhode Island because the first-to-file rule did not apply because the affected minors' independent constitutional privacy claims "were neither raised nor considered in Texas and could not have been, as the affected parties were absent."); *In re Admin. Subpoena 25-1431-032 to R.I. Hosp*, _ F. Supp. 3d. _, 2026 WL 1392565, at *1–*3 (quashing subpoena in same case, finding that DOJ had misrepresented and withheld information from both the Rhode Island court and the Northern District of Texas in an effort to shield its tactics from review in favor of a distant forum).[6]

## C.    REBUFFED BY COURTS ON THEIR ADMINISTRATIVE SUBPOENAS, DOJ PIVOTS TO GRAND JURY SUBPOENAS SEEKING THE SAME PHI

DOJ has now responded to these unfavorable court decisions by accelerating its improper efforts to obtain PHI and pivoting to criminal grand jury proceedings, also in the Northern District of Texas. While the nature of any alleged criminal conduct under investigation is unknown, a statement issued by NYU Langone Hospitals ("Langone") in New York City disclosed that on May 7, 2026, it "was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas."[7] The statement included a copy of the subpoena.[8] On information and belief, Stanford was one of the institutions that received a substantively identical grand jury subpoena.

The grand jury subpoenas issued to Langone, and, on information and belief, to Stanford, seek patient identifying information and PHI that is substantially similar to the information sought by the administrative subpoenas previously quashed by multiple district courts as lacking any proper

---

[6] In late April, DOJ filed a civil enforcement petition against Rhode Island Hospital in the Northern District of Texas, asserting that its investigation was "being carried out in" that district. Gov't Pet. for Enforcement of Admin. Subpoena Pursuant to 18 U.S.C. § 3486 at 2, *In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026) (ECF 1). Within hours—and without notice to the hospital or any affected patient—the Texas district court granted the petition. Order, *id.* (N.D. Tex. Apr. 30, 2026) (ECF 2). The Rhode Island Child Advocate sought emergency relief in Rhode Island on behalf of affected minors, leading to the decisions cited here.

[7] Information for NYU Langone Health Patients, NYU Langone Health, https://nyulangone.org/public-notices/TYHPsubpoena (last visited May 27, 2026).

[8] Grand Jury Subpoena to NYU Langone Health (May 7, 2026), https://nyulangone.org/files/nyu-gj-subpoena.pdf.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

investigative purpose. Specifically, the following demands from the Langone subpoena directly seek identifying information and PHI:

Subpoena specification 12 seeks "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures."

Subpoena specification 13 seeks, for each patient so identified, "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided."

Subpoena specification 14 seeks "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones."

The grand jury subpoenas issued to Langone, and, on information and belief, to Stanford, define "Sex-Rejecting Procedures" covered by the subpoenas to include:

any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures.

On information and belief, Stanford now faces a federal grand jury subpoena backed by the threat of enforcement and contempt if it does not comply. Unless this Court acts, Stanford will be conscripted to produce Plaintiffs' patient-identifying medical and mental health records to federal prosecutors in Texas without notice to Plaintiffs and before Plaintiffs have any meaningful opportunity to have their constitutional objections heard.

## III. LEGAL STANDARD

The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def.*

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, these factors operate on a sliding scale; interim relief may issue if "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's] favor.'" *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). The threatened deprivation of constitutional rights constitutes irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

## IV.   ARGUMENT

### A.   THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE REQUESTED RELIEF

#### 1.   Plaintiffs Have Article III Standing to Seek Injunctive Relief Against Stanford.

Plaintiffs readily satisfy Article III's requirements of injury in fact, causation, and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury is the certain and imminent disclosure of Plaintiffs' identifying information and constitutionally protected health information to the federal government in response to the grand jury subpoena, which will occur, on information and belief, no later than June 10. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (imminence satisfied where threatened injury is "'certainly impending'"). That injury is fully redressable by an injunction preventing Stanford from disclosing the records.

#### 2.   This Court May Adjudicate Plaintiffs' Constitutional Challenge to Stanford's Compliance with an Out-of-District Grand Jury Subpoena.

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and authority to issue equitable relief under the All Writs Act (28 U.S.C. § 1651) and the Declaratory Judgment Act (28 U.S.C. §§ 2201–2202). It has personal jurisdiction over Stanford, which is headquartered and operates within this District. The fact that the subpoena issued from the Northern District of Texas does not divest this Court of authority to protect the constitutional rights of patients whose records are held within its jurisdiction.

The Second Circuit's decision in *New York Times Co. v. Gonzales* confirms that a third party whose own constitutional or privilege interests are threatened by a grand jury subpoena seeking

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

records held by someone else may bring a civil action for declaratory relief. 459 F.3d 160, 165–67 (2d Cir. 2006). There, the Times sued the United States and the Attorney General in the Southern District of New York, seeking a declaration that reporters' privileges barred enforcement of grand jury subpoenas seeking reporters' telephone records from third-party telephone providers. The Second Circuit held that the district court did not abuse its discretion by exercising jurisdiction over that declaratory judgment action, even though it concerned a grand jury proceeding in another district. *Id.* Although the Second Circuit ultimately rejected the privilege claim on the merits, it held that the district court properly exercised jurisdiction to consider that claim. *See id.* at 165–67, 174.

For all the same reasons, this Court has jurisdiction to consider Plaintiffs' constitutional challenges to production of their medical records. Like the New York Times in *Gonzales,* they are not parties to the grand jury proceeding. As in *Gonzales,* the subpoena is directed to a third party, Stanford, not to them. And as in *Gonzales,* they have filed an action seeking relief in the district where they reside and where the information at issue was created. *Gonzales* confirms that it is appropriate for the Court to consider Plaintiffs' challenges on the merits notwithstanding the pendency of the Texas grand jury proceeding.

The ongoing Rhode Island proceedings similarly confirm that affected patients' independent privacy claims are not subsumed by proceedings in the Northern District of Texas. In that administrative subpoena litigation, the Rhode Island court denied DOJ's motion to transfer to the Northern District of Texas, holding that the first-to-file rule did not apply because the affected minors' constitutional privacy claims "were neither raised nor considered in Texas and could not have been, as the affected parties were absent." Text Order on Gov't Mot. to Stay or for Transfer of Venue, *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007. The same is true here. Plaintiffs have not been served with subpoenas by the Texas grand jury and are not parties to any proceeding before that court. An action for declaratory and injunctive relief in the district where they reside, where their records are located, and where they obtained the relevant medical treatment, is an appropriate means for them to seek redress for the threatened violation of their constitutionally protected privacy interests.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

### 3.    The Grand Jury Context Does Not Immunize the Subpoena from Constitutional Challenge.

The Supreme Court has long recognized that grand jury subpoenas are presumptively reasonable and that grand juries are vested with broad investigative authority. *See generally United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297–301 (1991). But it is equally well established that a grand jury subpoena may not compel production of records or testimony in violation of an individual's constitutional rights. *See, e.g., In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1088 (9th Cir. 2016) (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)). For example, "where a grand jury's subpoena, given its overbreadth, would *itself* violate the privacy interests protected by the Fourth Amendment, '[j]udicial supervision is properly exercised in such cases to prevent the wrong before it occurs.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 346 (1974)).

To be sure, in ordinary grand jury proceedings, "[n]o affidavit of relevance and need must be introduced" and that "legitimate purpose may be derived from the fact that a subpoena is necessary to a legitimate pursuit and the presumption that the government obeys the law." *In re Grand Jury Proceeding*, 721 F.2d 1221, 1223 (9th Cir. 1983). But Plaintiffs do not ask this Court to supervise routine grand jury relevance. They seek only to prevent a specific, imminent disclosure of their own constitutionally protected medical records where the record shows that DOJ has repeatedly sought materially identical patient information through administrative subpoenas, multiple courts rejected those demands as disconnected from DOJ's asserted theories, and DOJ then repackaged the same patient-data demands as grand-jury subpoenas.

The evidence of improper purpose here is substantial. DOJ spent the better part of 2025 attempting to obtain materially identical patient information through administrative subpoenas under 18 U.S.C. § 3486. Multiple federal district courts have quashed those subpoenas—many concluding that DOJ had "issued the subpoena[s] first and searched for a justification second." *QueerDoc*, 807 F. Supp. 3d at 1303. DOJ's response was not to articulate a legitimate investigative need for Plaintiffs' identifying medical records, but to repackage materially similar demands as grand jury subpoenas issued from a forum with no apparent connection to Stanford, Plaintiffs, or their care. That pattern is strong evidence that judicial review is necessary before Plaintiffs' constitutional rights are extinguished. *See In re Subpoena No. 25-1431-016*, 2025 WL 3562151, at *13.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

This background is relevant not because grand jury subpoenas and administrative subpoenas are subject to identical requirements, but because the administrative subpoenas implicate the same substantive constitutional problem: DOJ has repeatedly sought the same category of patient-identifying medical records under shifting legal labels, and courts have repeatedly found that those records bear no adequate connection to DOJ's asserted FDCA or fraud theories. The government cannot cure that mismatch simply by repackaging the same patient-data demands as grand jury process. Indeed, as the recent Rhode Island decision explained, DOJ cannot "immunize any coercive investigation from the improper purpose doctrine simply by appending an untenable legal theory to it." *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007, 2026 WL 1329792, at *8 (D.R.I. May 13, 2026). Constitutional privacy limits apply regardless of the procedural vehicle used to compel disclosure. *See, e.g., Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929–31 (7th Cir. 2004) (quashing trial subpoena for patient records on patient-privacy grounds).

**B.  BECAUSE STANFORD'S COMPLIANCE WITH THE FEDERAL SUBPOENA IS FAIRLY ATTRIBUTABLE TO THE GOVERNMENT, THIS COURT MAY ENJOIN DISCLOSURE THAT WOULD VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS**

Plaintiffs' constitutional claims require a showing that Stanford's challenged conduct—the disclosure of Plaintiffs' identifying information and PHI in response to federal compulsory process—is fairly attributable to the government. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). Stanford is, in ordinary circumstances, a private actor. But where the federal government uses compulsory process to command a private custodian to take actions that would violate third parties' constitutional rights, the resulting conduct constitutes governmental action for purposes of constitutional review.

The Supreme Court's decision in *Skinner v. Railway Labor Executives' Association*, establishes the controlling framework. 489 U.S. 602 (1989). There, the Court held that drug testing conducted by private railroads pursuant to federal regulations constituted state action because the government had "removed all legal barriers" to the testing and "made plain not only its strong preference for [the conduct], but also its desire to share the fruits of such intrusions." *Id.* at 615. The railroads acted as private entities, but the government's authorization, encouragement, and intended

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

use of the results were sufficient to render the resulting Fourth Amendment intrusion governmental. *Id.* at 614–16. Here, the grand jury subpoena does not merely permit Stanford to disclose Plaintiffs' records; it commands disclosure, removes legal barriers (including HIPAA's privacy protections, *see* 45 C.F.R. § 164.512(f)) that would otherwise prohibit Stanford from producing the information, and has been issued for the express purpose of placing the records in the hands of federal officials.

The "state compulsion" and governmental "nexus" tests for state action that are applied in this Circuit further demonstrate that Stanford's disclosure of Plaintiffs' private information pursuant to the subpoena would constitute governmental action. *See, e.g.*, *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 755 (9th Cir. 2024). Under the state compulsion test, a private party may be considered a state actor "if it has acted because the government coerced or compelled it to do so." *Id.* at 759. That test is satisfied where the government "has exercised coercive power or has provided such significant encouragement" that the challenged choice must be deemed the government's own. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Compulsion occurs when officials "convey a threat of adverse government action" or otherwise impose incentives that "'overwhelm'" and "'essentially compel'" compliance. *Children's Health Def.*, 112 F.4th at 759 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024); *O'Handley v. Weber*, 62 F.4th 1145, 1158 (9th Cir. 2023)). Similarly, under the governmental nexus test, state action is present "when government officials threaten adverse action to coerce a private party into performing a particular act." *O'Handley*, 62 F.4th at 1157. These tests recognize that the government may not "do indirectly what [it] is barred from doing directly," *Vullo*, 602 U.S. at 190, including by threatening prosecution or other adverse action to induce a private party to take constitutionally forbidden action. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963).

Here, a federal grand jury subpoena is not a request; it is a legal command backed by contempt authority. *See* Fed. R. Crim. P. 17(g). Under either of these tests, Stanford's production of records in response to the subpoena would not be the voluntary action of a private party; it would be the product of federal compulsion and make Stanford the instrument of government action.

The Ninth Circuit's decision in *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987), confirms this conclusion in a closely analogous

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

setting. There, a private telephone company terminated service to a content provider after a county prosecutor threatened to prosecute the company if it continued to carry the disfavored content. The Ninth Circuit held that the termination was state action: "[s]imply by 'command[ing] a particular result,' the state had so involved itself that it could not claim the conduct had actually occurred as a result of private choice." *Id.* at 1295 (quoting *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963)). The grand jury subpoena to Stanford involves precisely such particularized state participation. It directs a specific entity (Stanford), to take a specific action (produce identified categories of PHI), with respect to specific persons (Stanford's transgender patients, including Plaintiffs). The legal consequences of non-compliance—contempt and possible criminal sanction— are at least as serious as the threat of prosecution at issue in *Carlin*.

To be sure, this does not mean that *every* recipient of a grand jury subpoena becomes a state actor for every purpose. The particular sequence of events here—and the specific impact on third parties' constitutional rights—matter. As noted above, the federal government has embarked on a year-long campaign to obtain the identities and private medical records of every individual who has received pediatric transgender medical care at numerous institutions across the country, and at least eight district courts have rejected those efforts as lacking any proper purpose or adequate connection to DOJ's asserted investigative ends. In these circumstances, Stanford's participation in the government's centralized, ongoing scheme to violate Plaintiffs' constitutional privacy interests would be more than the passive compliance of a records custodian with an ordinary records request; instead, Stanford would be the instrument through which the government obtains records that courts have repeatedly concluded DOJ is not entitled to. That is the type of particularized governmental participation that Supreme Court and Ninth Circuit precedent establish as sufficient for constitutional review. *Cf. Khalil v. Trs. of Columbia Univ. in City of New York*, No. 25-CV-2079, 2026 WL 775813, at *7, *14–*16 (S.D.N.Y. Mar. 19, 2026) (holding plaintiffs plausibly alleged causation, redressability, and state action where federal actors allegedly coerced a private university to adopt and enforce policies or disclose records in a manner that would violate plaintiffs' constitutional rights).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

### C.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT STANFORD'S DISCLOSURE OF THEIR IDENTIFYING INFORMATION AND PHI WOULD VIOLATE THEIR RIGHT TO INFORMATIONAL PRIVACY

"[F]ederal constitutional law recognizes a 'right to informational privacy' stemming from 'the individual interest in avoiding disclosure of personal matters.'" *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 768 (9th Cir. 2020) (quoting *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999)). The Supreme Court first recognized that interest in *Whalen v. Roe*, which distinguished between "two different kinds of interests" in privacy cases: "the individual interest in avoiding disclosure of personal matters" and "the interest in independence in making certain kinds of important decisions." 429 U.S. 589, 599–600 (1977). Plaintiffs invoke the former interest here.[9]

The Ninth Circuit has expressly recognized the right to informational privacy and has applied it to compelled disclosures of medical information by health care providers. *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551–53 (9th Cir. 2004); *Endy*, 975 F.3d at 768.  The Ninth Circuit's decision in *Tucson Woman's Clinic* is most instructive. There, Arizona enacted a statutory and regulatory scheme requiring providers of abortion health care to permit "warrantless, unbounded inspections of their offices" by employees of the Department of Health Services and to provide access to patients' unredacted medical records. 379 F.3d at 537. The state also required providers to submit "ultrasound prints with patient identifying information on them to a private contractor" for review. *Id.* at 553. The Ninth Circuit affirmed summary judgment for the providers on their patients' informational-privacy claim. *Id*. Stanford's disclosure of patient medical records pursuant to the grand jury subpoena here violates Plaintiffs' right to informational privacy for the same reasons the statute and regulations in *Tucson Woman's Clinic* violated that right.

The Ninth Circuit balances several factors "to determine whether the governmental interest in obtaining information outweighs the individual's privacy interest." *Id.* at 551. Those factors are: "(1)

---

[9] The Supreme Court confirmed that distinction in *Dobbs v. Jackson Women's Health Organization.* 597 U.S. 215 (2022). In *Dobbs*, the Court explained that the term "right of personal privacy" has "two very different meanings": "the right to shield information from disclosure and the right to make and implement important personal decisions without governmental interference." *Id.* at 273 (citing *Whalen*, 429 U.S. at 599–600). Plaintiffs' informational privacy claim rests on the first meaning: the right to shield from compelled governmental disclosure their identities, transgender status, protected health information, and confidential medical records.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id.* (citing *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 790 (9th Cir. 2002)). Each factor weighs against disclosure here.

### 1.    The Type of Information Requested Is Among the Most Sensitive Medical Information a Provider Can Hold.

The first factor weighs heavily against disclosure because the information sought by the subpoena "is extremely broad, and includes patient identifying information such as names and full medical histories." *Id.* at 552. The grand jury subpoena, on its face, seeks information "sufficient to identify" each Stanford patient who received transgender medical care, and for each such patient, all "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for" that care. The records demanded for each Plaintiff are among the most sensitive categories of personal information,[10] essentially requiring disclosure of each Plaintiff's complete medical file concerning their receipt of transgender medical care. The Ninth Circuit has repeatedly held that medical records of this type are "'highly sensitive' personal information" protected by the constitutional right to privacy. *Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024) (quoting *Doe v. Garland*, 17 F.4th 941, 947 (9th Cir. 2021)).

These privacy interests are especially strong because the records at issue concern minors' medical care. Courts reviewing materially identical government subpoenas have recognized that demands for children's identities and confidential medical records trigger heightened privacy concerns. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 594 (holding that DOJ's demands for children's identities and clinical records implicated "intensely personal and sensitive medical information warranting the highest level of protection"); *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8. This factor strongly favors Plaintiffs.

---

[10] *See, e.g.*, B.B. Decl. ¶ 4 ("We had very personal conversations with Stanford providers about fertility, sexuality, mental health, depression, the long-term impacts of medical treatment, and other matters that my daughter would not want disclosed to anyone outside of her care team.").

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

## 2.    Nonconsensual Disclosure Would Cause Grave Harm.

The second factor—the potential for harm in any subsequent nonconsensual disclosure—also weighs decisively against disclosure, as "[t]he potential for harm in any subsequent non-consensual disclosure is obviously tremendous[.]" *Tucson Woman's Clinic*, 379 F.3d at 552. That concern is especially acute where, as here, disclosure would reveal information that is stigmatizing or likely to expose a person to discrimination, harassment, or violence. *See Crawford*, 194 F.3d at 960 (noting disclosure of HIV status or sexual orientation can "lead directly to injury, embarrassment, or stigma"); )*Powell v. Schriver*, 175 F.3d 107, 111–12 (2d Cir. 1999 (recognizing constitutional privacy interest in transgender status).

The potential for harm is not speculative. Disclosure would expose Plaintiffs and their families to the risk of harassment, discrimination, damage to educational and employment opportunities, loss of access to health care, government targeting, family separation, and prosecution.[11] Disclosure would also involuntarily reveal Plaintiffs' transgender status and their receipt of transgender medical care to federal law-enforcement officials. For several Plaintiffs, that information is not publicly known.[12] Involuntary disclosure of a minor's transgender status is itself a serious harm, exposing the child "to stigma, bullying, fear, and violence." *D.T. v. Christ*, 552 F. Supp. 3d 888, 897 & n.8 (D. Ariz. 2021).

That risk is magnified by the context in which Stanford would provide DOJ these records. The President has declared that pediatric transgender medical care "must end," and the Attorney General has characterized that care as "mutilation" and a "warped ideology." The Administration's

---

[11] *See, e.g.*, A.A. Decl. ¶ 10 ("I fear that the government wants to prosecute providers, and possibly even parents, for seeking care that is in the best interests of transgender children. My greatest fear is that the government could try to take my child away from me because I supported his care."); C.C. Decl. ¶ 12 ("Disclosure would make me fear for my family's safety. I am scared of death threats, harassment of my child, and professional consequences for me, including being fired from my job."); E.E. Decl. ¶ 12 ("Disclosure would affect both my son's physical safety and mental health. I am scared for him being outed when he has not chosen to be, especially because he is entering high school. His whole life would change if his medical records were disclosed."); F.F. Decl. ¶ 13 ("Disclosure of my records would cause severe emotional harm.").

[12] *See, e.g.*, C.C. Decl. ¶ 5 ("My child has come out to only a couple of people. They are not publicly telling people that they are transgender."); D.D. Decl. ¶ 4 ("My son prefers not to talk about the fact that he is transgender. His friends and many of the people he interacts with do not know that he is transgender."); E.E. Decl. ¶ 5 ("My son is not publicly out as transgender. His school, friends, and community do not know that he is transgender. He is also a very private person generally.").

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

widely publicized campaign, across multiple agencies, to denigrate, investigate, and deter transgender medical care gives rise to a realistic concern that Plaintiffs' information will be broadly disseminated within the government and used for purposes unrelated to any legitimate investigation. Courts reviewing materially identical subpoenas have credited the same concern. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 599–600. In this environment, compelled disclosure of Plaintiffs' identities and medical records would expose Plaintiffs and their families to the very harms the informational-privacy doctrine exists to prevent.

Disclosure would also harm the doctor-patient relationship.[13] The records at issue were generated in a relationship of trust between patients, parents, physicians, and mental-health providers. Compelled disclosure would breach that relationship and undermine the very conditions that permit accurate diagnosis, effective treatment, and candid disclosure of sensitive information. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 600–01 ("Patients and families who believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns[.]"). If Stanford produces Plaintiffs' records to the federal government because they received transgender medical care, Plaintiffs and other patients will reasonably fear that information disclosed in confidence to health care providers can later be turned over to law enforcement. Courts have repeatedly recognized that such fear chills access to care and undermines candor in treatment. *See, e.g., Nw. Mem'l Hosp*, 362 F.3d at 929 (cautioning that hospital "will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment" if it fails to "shield the medical records of its abortion patients from disclosure"); *Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*, No. C03-4872, 2004 WL 432222, at *2 (N.D. Cal. Mar. 5, 2004) ("[T]he potential for injury to the relationship between patient and provider is significant given

---

[13] *See, e.g.,* A.A. Decl. ¶ 11 ("Disclosure would affect our family's willingness to seek care and share sensitive information in the future . . . If Stanford turns over our information, we would never go back there, and it would be incredibly difficult to find providers who are as competent and whom my son would trust."); B.B. Decl. ¶ 5 ("Privacy was essential to my daughter's ability to process what she was experiencing and to speak candidly with providers. She would not have been willing to speak openly with Stanford providers if she knew that information could be disclosed outside the medical-care setting."); D.D. Decl. ¶ 5 ("It was important that my son felt Stanford was a safe place and that the providers were there to help him. Privacy was important to his ability to participate in care.").

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

the providers' pledge of confidentiality.").

### 3. There Are No Adequate Safeguards Against Unauthorized Disclosure or Misuse.

The third factor—the adequacy of safeguards to prevent unauthorized disclosure—also weighs strongly against disclosure. As in *Tucson Woman's Clinic*, there are no adequate protections "against release of information to government employees who have no need for the information." 379 F.3d at 552. "Even if a law adequately protects against *public* disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information." *Id.* at 551–52 (citing *Lawall*, 307 F.3d at 789–90).

The subpoena itself offers no safeguards or guarantees concerning the use of Plaintiffs' identities or private medical records, no information concerning the investigatory purpose for which the government is seeking the records or to whom they may be disclosed, no details on which government employees will have access to these records, and no assurances that these records will not be used for the purpose of harassment or intimidation of Plaintiffs or others who have received transgender health care.

Federal Rule of Criminal Procedure 6(e) does not cure the problem. Although Rule 6(e) establishes some constraints on public disclosure of grand jury information, it contains exceptions permitting disclosure to "an attorney for the government for use in performing that attorney's duty," disclosure to federal or state government personnel "that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law," and disclosure to another federal grand jury. Fed. R. Crim. P. 6(e)(3)(A)(i), (ii); 6(e)(3)(C). Those exceptions do not meaningfully limit intra-governmental dissemination or prevent use of Plaintiffs' information for purposes far removed from any lawful need for their patient-identifying medical records.

These limitations do not prohibit the government from using information obtained from a grand jury subpoena against patients in other criminal proceedings, or against patients' parents, a group of people whom the government has, in no uncertain terms, accused of child abuse, despite overwhelming evidence that what these parents are doing—supporting their transgender children in

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

lawfully obtaining essential medical care—leads to positive outcomes for these youth. Indeed, DOJ announced its intention to partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners, and the Attorney General directed all U.S. Attorneys to investigate all suspected cases of transgender medical treatment and to prosecute all offenses to the fullest extent possible. [14] *See In re: Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 603 (applying analogous factor to similar requests and concluding that DOJ "offers nothing to mitigate a concern for these children and their families given these pronouncements"). Such information sharing is particularly concerning to any parent who sought lawful, medically-recommended care for their transgender child that is now being falsely characterized as child abuse. *Tucson Woman's Clinic*, 379 F.3d at 551-52 ("Even if a law adequately protects against *public* disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information.") (citing *Lawall*, 307 F.3d at 789-90). The third factor strongly favors Plaintiffs.

### 4.    The Government Has No Demonstrated Need for Plaintiffs' Identities or PHI.

The fourth factor—the government's degree of need for access—likewise weighs strongly against disclosure. As in *Tucson Woman's Clinic*, "[w]eighing even further against the medical record access is the fact that there is little, if any, need for much of this information, such as the names and addresses of patients." *Id.* at 552. The subpoena offers no indication of the purpose for which Plaintiffs' information is being demanded. It does not state why Plaintiffs' medical records are relevant to any investigation that may be underway, let alone offer any explanation as to why that

---

14 *See* Memorandum for Select Component Heads re Preventing the Mutilation of American Children, Off. Att'y Gen. at 3-4, 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (directing all U.S. Attorneys to investigate and prosecute all suspected providers of "gender-affirming care," directing other components of DOJ to investigate FCA and FDCA claims based on same, and announcing partnership with state attorneys general to support state-level prosecution of these providers); Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, Dep't of Just., Off. of Pub. Affs. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical (stating that medical professionals and organizations who provide this care "in the service of a warped ideology will be held accountable by this Department of Justice").

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

investigation could not be conducted without that information. This mismatch between the information sought and any legitimate investigative need is fatal under the Ninth Circuit's balancing test. In decisions quashing substantively similar DOJ administrative subpoenas seeking transgender patients' private medical records, numerous district courts have found that DOJ failed to establish any legitimate purpose or need for seeking the identities of transgender patients and the most intimate details of their medical histories and treatment. *See In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8 ("If the Government is pursuing FDCA violations, it is utterly unclear to this court why the Government demands production of adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms."); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 605 ("Nothing in the present record establishes a need . . . for the patient-identifying clinical files . . . .").[15]

The Eastern District of Pennsylvania's analysis of substantively identical patient-data requests is especially instructive. The court distinguished between requests for billing data, insurance-claim submissions, coding guidance, communications with insurers, and manufacturer-related materials— which could plausibly relate to the commercial conduct DOJ invoked—and requests for child-patient identities, psychosocial evaluations, diagnoses, treatment rationales, informed-consent forms, intake assessments, and family-authorization documents. The latter materials, the court held, "reflect individualized clinical care and deeply personal medical disclosures" and "do not speak to how products were labeled, marketed, introduced into interstate commerce, or billed to health care benefit plans." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578. The same distinction controls here because Subpoena Specifications 12 through 14 seek the same patient-identifying categories CHOP found disconnected from DOJ's stated FDCA and fraud theories. The District of Maryland reached the same conclusion: "The Government seeks to investigate how the Hospital treats its patients," but "the FDCA regulates commerce, not patient care." *In re 2025 Subpoena to Children's Nat'l Hosp.*,

---

[15] *See also In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8–*9; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 236–39; *QueerDoc*, 807 F. Supp. 3d at 1303–04; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578–81, 588–607; *In re Subpoena No. 25-1431-016*, 2025 WL 3562151, at *13; *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *2–3; *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, 2026 WL 1329792, at *8.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

2026 WL 160792, at *8.

As previously noted, DOJ's own conduct in the administrative subpoena context reinforces the conclusion that patient-identifying information is unnecessary for any legitimate investigation. In the Children's Hospital of Los Angeles matter, DOJ "withdrew Subpoena Requests 11, 12, and 13 in their entirety" and agreed that the hospital could redact any patient-identifying information from its production. *See* Settlement Agreement, *In re 2025 Children's Hosp. of L.A. Subpoena*, No. 2:25-cv-11183 (C.D. Cal. Jan. 22, 2026) (ECF 25-1). With respect to University of Pittsburgh Medical Center, DOJ disclosed that it had "revised its agreement with [hospital] counsel so that the subpoena would be fully satisfied by production of only de-identified records" and had "no current plans" to issue another HIPAA subpoena for unredacted patient information. Gov't Supp. Br. at 2, *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069 (W.D. Pa. Jan. 16, 2026) (ECF 58). Perhaps most telling, on May 6, 2026—the very day its Third Circuit opening brief was due—DOJ dismissed its appeal of the Eastern District of Pennsylvania's order striking Requests 11–13 in the substantively identical subpoena to Children's Hospital of Philadelphia. Br. in Supp. of Mot. to Confirm Jurisdiction at 4, *In re Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa. May 6, 2026) (ECF 47-1). These concessions confirm what multiple courts have independently concluded: DOJ can pursue any genuine FDCA or fraud investigation without obtaining children's identities or medical files. If DOJ does not need this information to investigate the above-mentioned hospitals, it cannot demonstrate any greater need for the information as it relates to Stanford.

Moreover, even if the subpoena did not on its face require production of unredacted medical records, redaction of certain items such as names and addresses could not avert the realistic risk of reidentification of Plaintiffs and disclosure of their intimate medical details.[16] In a closely analogous context, the Seventh Circuit affirmed an order quashing a DOJ subpoena for redacted abortion records. *See Nw. Mem'l Hosp.*, 362 F.3d at 929–31. The court emphasized that in a highly charged

---

[16] *See, e.g.,* A.A. Decl. ¶ 12 ("I do not believe removing names or obvious identifiers would protect my child's privacy. Details such as his age, dates of care, treatment history, providers, diagnosis, family circumstances, and location of care could still identify him."); E.E. Decl. ¶ 14 ("I do not believe removing names or obvious identifiers would protect my child's privacy. With advanced technology and the details contained in medical records, I believe it would be easy to identify my son and our family.");

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-
RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

social environment, acquaintances or "skillful 'Googlers'" can "put two and two together," that granular clinical narratives or descriptions contained in redacted medical records can effectively reidentify patients, and that compelled disclosures erode patients' trust in medical providers and discourage them from seeking needed care. *Id.*

Those concerns apply with even greater force here. Current federal directives expressly target transgender health care, describe it as "mutilation," direct government-wide action, and call for coordinated investigations and information sharing with state authorities. This antagonistic environment magnifies every factor identified by the court in *Northwestern Memorial*: the concrete risk of reidentification despite redaction; the dignitary injury from disclosure of intimate details; the severe chilling effect on access to care; and the undermining of institutional trust. In short, producing even so-called "de-identified" or redacted records would endanger privacy and safety and chill minors' access to medically necessary care. The fourth factor favors Plaintiffs.

### 5. No Statutory Mandate, Public Policy, or Recognizable Public Interest Justifies Disclosure of Plaintiffs' Identifying Information and PHI.

The fifth factor—whether an express statutory mandate, articulated public policy, or other recognizable public interest militates toward access—also weighs against disclosure. The subpoena does not reveal how disclosure of Plaintiffs' identifying information and PHI promotes any identifiable public interest. To the contrary, the record indicates that DOJ is using the grand jury subpoena to obtain the same patient-identifying records that multiple courts have already held it was not entitled to obtain through materially similar administrative subpoenas. Even if the government could show some legitimate purpose for its investigation generally, nothing in the subpoena indicates how disclosure of Plaintiffs' identities and PHI "promotes this need." *Tucson Woman's Clinic*, 379 F.3d at 553.

Under *Tucson Woman's Clinic*, a generalized invocation of a public interest in law enforcement cannot automatically override constitutional privacy rights in highly sensitive medical records. If it could, the balancing test would have no force in the very cases where it matters most. The government must identify a concrete and particularized interest in the specific information sought. It has not done so.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMO-RANDUM OF POINTS AND AUTHORITIES IN SUPPORT

The articulated public policy surrounding the subpoena cuts the other way. The Administration has publicly declared that pediatric transgender medical care "must end," described this care in stigmatizing and inflammatory terms, and directed DOJ to use federal enforcement tools to end it. In related subpoena litigation, courts have repeatedly found that DOJ's demands for transgender minors' identifying information and PHI were tied to an improper effort to target this care rather than any legitimate need for children's medical files. *See QueerDoc,* 807 F. Supp. 3d at 1304 ("The Executive Orders, the Attorney General's directives, the mismatch between the stated investigative focus and QueerDoc's operations, and the breadth of the document requests collectively demonstrate that the subpoena serves to pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct."); *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8 ("[T]he Subpoena is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare."); *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, 2026 WL 1392565, at *8 ("The Administration has publicly characterized gender-affirming care for minors as abuse, directed the DOJ to bring its practice to an end, and celebrated when hospitals curtailed such programs as a result of this subpoena campaign.").

The public interest favors protecting minors' medical privacy, preserving the confidentiality of the doctor-patient relationship, preventing misuse of law-enforcement authority to expose stigmatized medical information, and ensuring that patients and families can seek lawful medical care without fear that their most intimate records will be turned over to the federal government. The fifth factor strongly favors Plaintiffs.

In sum, an assessment of the *Tucson Woman's Clinic* factors shows that Stanford's disclosure of Plaintiffs' identifying information and PHI would violate Plaintiffs' informational privacy rights. Plaintiffs are likely to succeed on this claim. At a minimum, Plaintiffs raise serious questions going to the merits, warranting preliminary relief to prevent disclosure while this action proceeds.

### D. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The irreparable harm standard is satisfied as to each Plaintiff. The Ninth Circuit has held that the threatened deprivation of constitutional rights, for even minimal periods of time, "unquestionably

constitutes irreparable injury." *Melendres*, 695 F.3d at 1002 (quoting *Elrod*, 427 U.S. at 373).

That rule applies here because Plaintiffs have shown, at a minimum, serious questions that Stanford's disclosure would violate their constitutional rights. In any event, the harm to Plaintiffs from disclosure is independently irreparable on its own terms. Once Stanford produces the records, Plaintiffs' privacy interest in the information they contain is permanently and irrevocably destroyed. The federal government will possess a comprehensive record of the most intimate details of each Plaintiff's medical history—including the symptoms, diagnoses, and clinical assessments that supported each Plaintiff's care; the specific treatments received; and the course, results, and prognosis of that care—obtained without notice, without warrant, and without any opportunity for Plaintiffs to object on grounds of privilege or constitutional protection. No award of damages can restore the confidentiality of information once disclosed. No subsequent order can recall the records from government custody, prevent their further distribution under the exceptions catalogued in Federal Rule of Criminal Procedure 6(e)(3), or undo their use in derivative investigations, prosecutions, or referrals.

The harm is also imminent. On information and belief, the return date for the grand jury subpoena issued to Stanford is no later than June 10, 2026. Without a TRO issued before that date, the constitutional harm will be complete as to all Plaintiffs and the Court will no longer have any effective means of providing the primary relief sought in this litigation. The imminence of the constitutional harm is not speculative — it will occur on a specific known date absent judicial intervention, and it will occur within this District.

The pendency of the grand jury proceeding in the Northern District of Texas heightens, rather than diminishes, the need for emergency relief here. Plaintiffs' records, providers, and treatment relationships are in this District, and Stanford is subject to this Court's personal jurisdiction. Stanford's production of Plaintiffs' private medical records would occur from California. Plaintiffs have no records, residence, treatment relationship, or other connection to the Northern District of Texas that would make it reasonable to require them to seek relief there on the eve of disclosure. This Court is the forum with the most direct connection to Plaintiffs, Stanford, and the threatened injury.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

**E.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PRELIMINARY RELIEF**

The balance of equities tips sharply in favor of granting preliminary relief to preserve the status quo and prevent an irreparable infringement of Plaintiffs' constitutional rights. Denial of relief would result in the permanent and irreversible destruction of Plaintiffs' privacy interest in their identifying information and PHI. This is a harm that, once inflicted, cannot be undone regardless of how this litigation ultimately resolves.

Stanford would suffer no cognizable harm from interim relief. At most, it would experience a delay in producing the specific patient-identifying records challenged here while this Court resolves Plaintiffs' constitutional claims; the requested injunction does not prevent Stanford from responding to any portions of the subpoena that do not seek Plaintiffs' identifying information or PHI. Any administrative burden Stanford may face is greatly outweighed by the permanent constitutional injury that would be inflicted on Plaintiffs if a TRO and preliminary injunction are denied.

Similarly, to the extent that any burden on the United States is relevant to this motion as a consideration of the public interest, any such burden is likewise far outweighed by the threatened permanent extinguishment of Plaintiffs' constitutional privacy interests. The government has no cognizable interest in obtaining Plaintiff's records by unconstitutional means. If the subpoena is constitutionally permissible, the government loses nothing by waiting for this Court's judgment other than a temporary delay in reviewing Plaintiffs' records as part of any investigation it may be conducting. Plaintiffs' records are one small part of an investigation that the government's own public statements confirm has gone on for nearly 12 months and involve its attempt to obtain the records of every patient treated by more than 20 doctors and clinics around the country. To date, that investigation has resulted in no civil or criminal charges and at least eight federal district court decisions quashing its subpoenas on the ground that they lack any legitimate investigatory purpose.

The public interest also strongly favors relief. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)). The public interest here is amplified by the scope of the threatened constitutional violation. The government's simultaneous targeting of

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

multiple transgender individuals who reside in this District—and many more across the country—highlights the public importance of ensuring that any investigation is conducted through constitutionally valid methods. If this Court denies preliminary relief, the government's effort to halt pediatric transgender medical care through intimidation and fear unsupported by any legitimate investigatory purpose will proceed unchecked. The privacy of multiple residents of this District will be permanently compromised, and the chilling effect on transgender individuals' willingness to seek medically necessary care will be felt across the community. This Court's intervention to ensure constitutional compliance before widespread harm is inflicted is squarely in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction enjoining Stanford from producing Plaintiffs' identifying information and protected health information in response to the federal grand jury subpoena issued by the United States District Court for the Northern District of Texas, or any substantially similar subpoena, request, or order issued by any court, official, or agency.

DATED: May 27, 2026                    Respectfully submitted,

                                       ROSEN BIEN GALVAN & GRUNFELD LLP


                                       By:   /s/ Kara J. Janssen
                                             Kara J. Janssen

                                       Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT