SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, California  94102
Telephone:(415) 392-6257
Email:      sminter@nclrights.org
            cstoll@nclrights.org
            awhelan@nclrights.org
            rberg@nclrights.org

ABBE DAVID LOWELL (*pro hac vice*)
CALEB HAYES-DEATS (*pro hac vice*)
SCHUYLER STANDLEY (*pro hac vice*)
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
Facsimile:  (202) 964-6116
Email:
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
Sstandley@lowellandassociates.com
Attorneys for Plaintiffs

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:       ggrunfeld@rbgg.com
             kjanssen@rbgg.com

JOSHUA ROVENGER (*pro hac vice*)
DONOVAN BENDANA (*pro hac vice*)
GLBTQ LEGAL ADVOCATES &
DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts  02108
Telephone:(617) 426-1350
Email:      jrovenger@gladlaw.org
            dbendana@gladlaw.org

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

Z.A., a minor, by and through their parent, A.A.; Z.B., a minor, by and through their parent, B.B.; Z.C., a minor, by and through their parent, C.C.; Z.D., a minor, by and through their parent, D.D.; Z.E., a minor, by and through their parent, E.E.; F.F.; and Z.G., a minor, by and through their parents, G.G. and A.G., on behalf of themselves and all those similarly situated,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; and LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD, a California nonprofit public benefit corporation,

Defendants.

Case No. 5:26-cv-04998-PCP

**PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**PROPOSED CLASS ACTION**

Assigned to: Hon. P. Casey Pitts

**RELIEF REQUESTED BY JUNE 9, 2026, AT 5:00PM**

Trial Date:   None Set

Case No. 5:26-cv-04998

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

STATEMENT OF FACTS...................................................................................................... 2

    I.    The Trump Administration Attempts to End Pediatric Transgender Medical Care ............ 2

    II.   DOJ Issues 20 Substantively Identical HIPAA Subpoenas Seeking the Same PHI ............ 3

    III.  DOJ Pivots To Grand Jury Subpoenas Seeking the Same PHI ......................................... 4

    IV.  Procedural History ........................................................................................................ 5

LEGAL STANDARD ............................................................................................................ 6

ARGUMENT ........................................................................................................................ 7

    I.    THIS COURT HAS JURISDICTION AND AUTHORITY TO
        GRANT THE REQUESTED RELIEF ................................................................... 7

       A.  Plaintiffs Have Article III Standing to Seek Injunctive Relief Against Defendants. ........ 7

       B.  This Court May Adjudicate Plaintiffs' Constitutional Challenge to Compliance
           with an Out-of-District Grand Jury Subpoena. ............................................................ 7

       C.  The Grand Jury Context Does Not Foreclose Constitutional Challenge. ...................... 10

    II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DOJ'S
        DEMAND FOR THEIR IDENTIFYING INFORMATION AND PHI WOULD
        VIOLATE THEIR RIGHT TO INFORMATIONAL PRIVACY ................................ 11

       A.  The Information Requested Is Highly Sensitive......................................................... 12

       B.  Nonconsensual Disclosure Would Cause Grave Harm................................................. 13

       C.  No Adequate Safeguards Against Unauthorized Disclosure or Misuse......................... 15

       D.  No Demonstrated Need for Plaintiffs' Identities or PHI.............................................. 17

       E.  No Statutory Mandate, Public Policy, or Recognizable Public Interest Justifies
          Disclosure of Plaintiffs' Identifying Information and PHI........................................... 19

    III.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT
         DOJ'S REQUESTS FOR THEIR INFORMATION VIOLATE THE
         FIRST AMENDMENT ........................................................................................ 21

    IV.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY
         RESTRAINING ORDER AND PRELIMINARY INJUNCTION ............................... 23

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PRELIMINARY RELIEF ...................................................... 24

CONCLUSION ............................................................................................................. 25

**TABLE OF AUTHORITIES**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................................................ 7

*Chiles v. Salazar,*
  146 S. Ct. 1010 (2026) ...................................................................................................... 22

*Clear Channel Outdoor, Inc. v. City of Los Angeles,*
  340 F.3d 810 (9th Cir. 2003) ............................................................................................. 7

*Coe v. Blanche,*
  No. 1:26-cv-4641 (S.D.N.Y. Jun. 10, 2026) ................................................................... 25

*Conant v. Walters,*
  309 F.3d 629 (9th Cir. 2002) ........................................................................................... 21

*D.T. v. Christ,*
  552 F. Supp. 3d 888 (D. Ariz. 2021) ............................................................................... 14

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ......................................................................................................... 12

*Doe v. Bonta,*
  101 F.4th 633 (9th Cir. 2024) ..................................................................................... 11, 13

*Doe v. Garland,*
  17 F.4th 941 (9th Cir. 2021) ....................................................................................... 11, 13

*Dow Jones & Co. v. Harrods Ltd.,*
  346 F.3d 357 (2d Cir. 2003) ............................................................................................... 9

*Elrod v. Burns,*
  427 U.S. 347 (1976) ........................................................................................................... 7

*Endy v. Cnty. of Los Angeles,*
  975 F.3d 757 (9th Cir. 2020) ...................................................................................... 11, 12

*First Choice Women's Resource Centers, Inc. v. Davenport,*
  146 S. Ct. 1114 (2026) ........................................................................................... 7, 21, 22

*Hale v. Henkel,*
  201 U.S. 43 (1906) ........................................................................................................... 10

*In re 2025 UPMC Subpoena,*
  No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) .................................. 3

*In re Admin. Subpoena No. 25-1431-019,*
  800 F. Supp. 3d 229 (D. Mass. 2025) ............................................................................... 3

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

*In re CNH Subpoena*, No. 25-cv-03780-JRR,
  2026 WL 160792 (D. Md. Jan. 21, 2026) ............................................................................. *passim*

*In re Crawford*,
  194 F.3d 954 (9th Cir. 1999) ................................................................................... 11, 13

*In re Grand Jury Proceeding*,
  721 F.2d 1221 (9th Cir. 1983) ........................................................................................ 10

*In re Grand Jury Subpoena, JK-15-029*,
  828 F.3d 1083 (9th Cir. 2016) ........................................................................................ 10

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
  No. 26-mc-12 (JEB), 2026 WL 710202 (D.D.C. Mar. 13, 2026) ................................... 10

*In re Horn*,
  976 F.2d 1314 (9th Cir. 1992) ........................................................................................ 20

*In re Sealed Case*,
  141 F.3d 337 (D.C. Cir. 1998) .......................................................................................... 8

*In re Subpoena Duces Tecum No. 25-1431-016*,
  No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) ............................ 3, 11, 13

*In re Subpoena No. 25-1431-014*,
  810 F. Supp. 3d 555 (E.D. Pa. 2025) ........................................................................... *passim*

*In re Subpoena*, No. 1:26-mc-0007,
  2026 WL 1392565 (D.R.I. May 14, 2026) ................................................................... 3, 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................................... 7

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ................................................................................. 7, 23, 25

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ........................................................................................................ 21

*N.Y. Times Co. v. Gonzales*,
  459 F.3d 160 (2d Cir. 2006) .......................................................................................... 8, 9

*Nw. Mem'l Hosp. v. Ashcroft*,
  362 F.3d 923 (7th Cir. 2004) ......................................................................... 11, 15, 19, 22

*Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*,
  No. 03-cv-4872, 2004 WL 432222 (N.D. Cal. Mar. 5, 2004) ....................................... 15

*Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*,
  122 F.4th 825 (9th Cir. 2024) ..................................................................................... 21, 23

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

*Planned Parenthood v. Lawall,*
  307 F.3d 783 (9th Cir. 2002) .......................................................................................... 12

*Powell v. Schriver,*
  175 F.3d 107 (2d Cir. 1999)............................................................................................ 13

*QueerDoc, PLLC v. U.S. Dep't of Just.,*
  807 F. Supp. 3d 1295 (W.D. Wash. 2025)................................................................*passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995)........................................................................................................ 23

*Sammartano v. First Judicial Dist. Ct.,*
  303 F.3d 959 (9th Cir. 2002) .......................................................................................... 25

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.,*
  240 F.3d 832 (9th Cir. 2001). .......................................................................................... 6

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014).......................................................................................................... 7

*Tucson Woman's Clinic v. Eden,*
  379 F.3d 531 (9th Cir. 2004) ....................................................................................*passim*

*United States v. Calandra,*
  414 U.S. 338 (1974)........................................................................................................ 10

*United States v. Comey,*
  809 F. Supp. 3d 396 (E.D. Va. 2025) ............................................................................. 16

*United States v. Powell,*
  379 U.S. 48 (1964).......................................................................................................... 10

*United States v. R. Enterprises, Inc.,*
  498 U.S. 292 (1991)........................................................................................................ 10

*United States v. Star,*
  470 F.2d 1214 (9th Cir. 1972) ........................................................................................ 10

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976)........................................................................................................ 23

*Whalen v. Roe,*
  429 U.S. 589 (1977)........................................................................................................ 11

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008).............................................................................................................. 6

Case No. 5:26-cv-04998
PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

**Statutes**

28 U.S.C. § 1331 ................................................................................................................ 7

28 U.S.C. § 1651 ................................................................................................................ 7

28 U.S.C. §§ 2201-2202 .................................................................................................... 7

**Other Authorities**

Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28. 2025) ............................................ 2

**Rules**

Fed. R. Civ. P. 45 ............................................................................................................. 8

Fed. R. Crim. P. 6 ............................................................................................................ 16

**Regulations**

45 C.F.R. § 164.502 ........................................................................................................ 19

45 C.F.R. § 164.512 ........................................................................................................ 19

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

**INTRODUCTION**

Plaintiffs and proposed class members are minors, young adults, and their parents who are being harassed by the U.S. Department of Justice ("DOJ") as a result of medical care they received, care that the State of California regards as medically necessary, but to which the DOJ has repeatedly declared its opposition. DOJ has served substantially identical administrative subpoenas on providers across the country. All such subpoenas seek deeply personal protected health information ("PHI") including: (1) documents identifying each minor patient who received transgender healthcare, (2) documents relating to indications, diagnoses, or assessments that formed the basis for that care, and (3) informed consents and parental authorizations signed in connection with that care. Courts have held that those subpoenas serve no legitimate investigative need, impermissibly intrude on patients' privacy, and were designed for no purpose other than to intimidate and harass hospitals, patients, and providers. As these subpoenas failed, DOJ has now issued grand jury subpoenas—seeking substantially the same information—to Defendant Lucile Salter Packard Children's Hospital at Stanford ("LPCH"), and on information and belief, to other hospitals providing pediatric transgender healthcare in California.

Plaintiffs bring this action to prevent DOJ from obtaining their PHI, and that of other, similarly situated patients, in violation of the First and Fifth Amendments. The Fifth Amendment bars DOJ from obtaining Plaintiffs' sensitive PHI without any legitimate interest in doing so. The PHI sought has no relation to any investigative need, as courts have repeatedly found. It is being sought to harass. That harassment also violates the First Amendment, which bars DOJ from using a subpoena to chill protected speech and association by requiring disclosure of records reflecting medical and mental health consultations on subjects DOJ dislikes. Plaintiffs respectfully move this Court *ex parte* for a temporary restraining order maintaining the *status quo* by temporarily barring DOJ from seeking their PHI while these issues are fully litigated. Because the subpoenas to LPCH and other hospitals demand compliance by June 10, 2026, immediate relief is necessary.

This Court previously denied a request for injunctive relief against LPCH "without prejudice to the filing of a renewed motion for a preliminary injunction in the event of materially changed facts or further development of the record." ECF 40 at 16. The Court did not "doubt the

strength of plaintiffs' constitutional interest in the preservation of their privacy or the gravity of harm that might result from unauthorized disclosure of their medical information (or their inability to access medically indicated care going forward)." *Id.* at 15. But it held that the "sparse record" before it did not support a finding that LPCH, the sole Defendant at the time, could be deemed a "government actor" for purposes of Plaintiffs' constitutional claims. *Id.* at 14-15. Plaintiffs' amendment of their complaint to add DOJ and the Acting Attorney General as Defendants is a material change for purposes of the Court's analysis. The same constitutional interests are at stake. The same harm is threatened. And now, DOJ is indisputably a state actor the Court can enjoin from violating Plaintiffs' and the proposed class's constitutional rights.

## STATEMENT OF FACTS

### I.    The Trump Administration Attempts to End Pediatric Transgender Medical Care

The Trump Administration has pledged to end pediatric transgender medical care. On January 28, 2025, the President issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," which declared "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support" any child's "transition," branded such care for minors a "stain on our Nation's history" that "must end," and directed the Attorney General to "prioritize enforcement of protections against" such care. Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28. 2025). Within days, the White House announced that the order was "already having its intended effect," listing hospitals that had paused or ended treatment.[1] DOJ promptly took action to effectuate the President's mandate. In April 2025, the Attorney General issued a memorandum, "Preventing the Mutilation of American Children," directing U.S. Attorneys to "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners," and warning DOJ would "hold accountable those who mutilate [our children] under the guise of care."[2]

---

[1] President Trump Is Delivering on His Commitment to Protect Our Kids, The White House (Feb. 3, 2025), https://www.whitehouse.gov/releases/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.
[2] Memorandum for Select Component Heads: Preventing the Mutilation of American Children at 3, 5, U.S. Off. Of the Att'y Gen. (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (DOJ April 2025 Memorandum).

**II.      DOJ Issues 20 Substantively Identical HIPAA Subpoenas Seeking the Same PHI**

The Administration initially pursued only civil investigations in its campaign to compel providers to stop offering and patients to stop seeking medically necessary transgender healthcare. On June 11, 2025, DOJ served more than 20 "substantively identical" administrative subpoenas under 18 U.S.C. § 3486 "to doctors and clinics involved in performing transgender medical procedures on children."[3] Six weeks later, the White House declared victory.[4] But federal district courts around the country swiftly halted many of DOJ's improper PHI demands, quashing the administrative subpoenas seeking patients' identifying information and PHI. *In re CNH Subpoena, No. 25-cv-03780-JRR,* 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (quashing subpoena for improper purpose); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236-39 (D. Mass. 2025) (quashing Boston Children's Hospital subpoena as issued for an improper purpose and "virtually unlimited in scope"); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303-04 (W.D. Wash. 2025), *appeal argued*, No. 25-7384 (9th Cir. Mar. 6, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578-81, 588-607 (E.D. Pa. 2025) (striking requests to Children's Hospital of Philadelphia ("CHOP") seeking patients' identities and medical data as beyond statutory authority and outweighed by minors' privacy interests); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025) (rejecting enforcement based on "DOJ's threadbare justification" and "strong evidence" of "improper purpose"); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *2-3 (W.D. Pa. Dec. 24, 2025) (granting patient movants' request for relief); *In re Subpoena*, No. 1:26-mc-0007, 2026 WL 1392565, at *8-10 (D.R.I. May 14, 2026) (quashing subpoena and

---

[3] Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, Off. of Pub. Affs., U.S. Dep't of Just. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical. *See also In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780, 2026 WL 160792, at *3 n.12 (D. Md. Jan. 21, 2026) (*In re CNH Subpoena*), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026). *See also* Email from Ross Goldstein, U.S. Dep't of Just., to Eve Hill (Nov. 14, 2025), Mot. to Quash Ex. W, *In re CNH Subpoena*, No. 1:25-cv-03780 (D. Md. Nov. 17, 2025) (ECF 1-38).

[4] President Trump Promised to End Child Sexual Mutilation—and He Delivered, The White House (July 25, 2025), https://www.whitehouse.gov/releases/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

collecting decisions finding improper purpose).

These decisions did not rest on technical defects unique to any one subpoena recipient. They found DOJ had issued the subpoenas for an "improper purpose," namely, seeking to "end the very practice it claims to be merely investigating." *QueerDoc*, 807 F. Supp. 3d at 1303-04. They identified the same core defects: DOJ's asserted investigative rationale—*i.e.*, potential violations of the Federal Food, Drug, and Cosmetic Act ("FDCA") and healthcare fraud statutes—is disconnected from its demands for children's intimate medical, psychological, and family information; and the subpoenas appear designed to advance the Administration's stated objective of ending transgender medical care. *See In re Subpoena Duces Tecum No. 25-1431-016*, 2026 WL 1102159, at *2 (noting "seven recent decisions" reached similar conclusions).

**III.    DOJ Pivots To Grand Jury Subpoenas Seeking the Same PHI**

DOJ responded to these unfavorable court decisions by accelerating its improper efforts to obtain PHI and pivoting to criminal grand jury proceedings in the Northern District of Texas. After losing repeatedly in court after court, DOJ "out of the blue" withdrew the administrative subpoenas and replaced them with "substantially similar" grand jury subpoenas. ECF 31-1 ¶6. While the nature of any alleged criminal conduct under investigation is unknown, a statement issued by NYU Langone Hospitals ("Langone") in New York City disclosed that on May 7, 2026, it "was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas."[5] The statement included a copy of the subpoena.[6] On June 3, LPCH disclosed that it had received a grand jury subpoena that is almost identical to NYU Langone's. On June 5, Mt. Sinai Hospital revealed that it, too, had received a grand jury subpoena calling for patient PHI.[7] So similar are the grand jury subpoenas received by LPCH and NYU Langone that both contain the *same* typo, a reference to "45 C.F.R., § 164.512 (f)(1(ii)(C)(1)-(3),"

---

[5] Information for NYU Langone Health Patients, NYU Langone Health, https://nyulangone.org/public-notices/TYHPsubpoena (last visited May 26, 2026).
[6] Grand Jury Subpoena to NYU Langone Health (May 7, 2026), https://nyulangone.org/files/nyu-gj-subpoena.pdf.
[7] *See* Joseph Goldstein, *Trump Administration Investigating Gender Treatments at Mount Sinai*, N.Y. Times (June 5, 2026), https://www.nytimes.com/2026/06/05/nyregion/trump-administration-investigating-gender-treatments-at-mount-sinai.html.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

with no closing parenthesis after "1." *Compare* ECF 31-2 at 9, *with* ECF 1 at 32.

The grand jury subpoenas issued to LPCH and, on information and belief, other providers in California, seek patient identifying information and PHI that is substantially similar to the information sought by the administrative subpoenas previously quashed by multiple district courts as lacking any proper investigative purpose. Specifically, the following demands from the LPCH grand jury subpoena directly seek identifying information and PHI:

- Subpoena specification 12 seeks "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures."

- Subpoena specification 13 seeks, for each patient so identified, "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided."

- Subpoena specification 14 seeks "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones."

The grand jury subpoenas issued to LPCH, and, on information and belief, other providers in California, define "Sex-Rejecting Procedures" covered by the subpoenas to include:

any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures.

The subpoenas demand information about every patient who received the such care at LPCH and, on information and belief, other hospitals in California.

**IV.     Procedural History**

On May 27, 2026, six individual patients and five parents filed this lawsuit, naming only LPCH as a Defendant. The individual plaintiffs moved for a temporary restraining order barring LPCH from producing their PHI to DOJ because such disclosure would violate their right to informational privacy under the Fifth Amendment, constitute an unreasonable search and seizure

in violation of the Fourth Amendment, and deny them equal protection of the law. The Court did not "doubt the strength of plaintiffs' constitutional interest in the preservation of their privacy or the gravity of harm that might result from unauthorized disclosure of their medical information (or their inability to access medically indicated care going forward)." ECF 40 at 15. But it held that the "sparse record" before it did not support a finding that LPCH, the sole Defendant at the time, could be deemed a "government actor" for purposes of Plaintiffs' constitutional claims. *Id.* at 14-15. While the Court acknowledged that DOJ threats could result in private actors such as LPCH being deemed to act on behalf of the government, and further that "DOJ has threatened providers of gender-affirming care with criminal investigation," it concluded that it needed proof of a "direct tie between DOJ's threats of prosecution and LPCH's disclosure of patient records." ECF 40 at 13-15. The "record before the Court" was undeveloped and did not have evidence of such a tie. *Id.*

On June 8, the 11 individual plaintiffs who filed the first complaint, plus 3 additional plaintiffs, filed an amended complaint that added DOJ as a Defendant, asserted claims under the First Amendment in addition to the Fourth and Fifth Amendments, and sought relief on behalf of not just the individual plaintiffs, but also other similarly situated patients and parents whose information has been sought from LPCH or other California hospitals. Plaintiffs now seek a temporary restraining order barring DOJ from obtaining proposed class members' PHI through the grand jury subpoenas served on LPCH and, on information and belief, other California hospitals, or through any other means that violate the First and Fifth Amendments of the Constitution.

## LEGAL STANDARD

The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, these factors operate on a sliding scale; interim relief may issue if "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's]

favor.'" *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). The threatened deprivation of constitutional rights constitutes irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

ARGUMENT

## I.    THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE REQUESTED RELIEF

### A.    Plaintiffs Have Article III Standing to Seek Injunctive Relief Against Defendants.

Plaintiffs readily satisfy Article III's requirements of injury in fact, causation, and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury is the certain and imminent disclosure of Plaintiffs' identifying information and constitutionally protected health information to DOJ, which will occur, on information and belief, no later than June 10. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (imminence satisfied where threatened injury is "'certainly impending'"). Moreover, the issuance of the subpoena and the threatened disclosure of patient identities and communications has created a chilling effect on Plaintiffs' and their providers' protected speech, violating Plaintiffs' First Amendment rights. *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026). These injuries are fully redressable by an injunction preventing DOJ from obtaining such records.

### B.    This Court May Adjudicate Plaintiffs' Constitutional Challenge to Compliance with an Out-of-District Grand Jury Subpoena.

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and authority to issue equitable relief under the All Writs Act (28 U.S.C. § 1651) and the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202). It has personal jurisdiction over DOJ, which operates within this District. The fact that at least one grand jury subpoena has issued from the Northern District of Texas does not divest this Court of authority to protect the constitutional rights of patients whose records are held within its jurisdiction and who reside within this State.

The Second Circuit's decision in *New York Times Co. v. Gonzales*, confirms that a third party whose own constitutional or privilege interests are threatened by a grand jury subpoena

seeking records held by someone else may bring a civil action for declaratory relief. 459 F.3d 160, 165-67 (2d Cir. 2006). There, the Times sued the United States and the Attorney General in the Southern District of New York, seeking a declaration that reporters' privileges barred enforcement of grand jury subpoenas seeking reporters' telephone records from third-party telephone providers. The Second Circuit held that the district court did not abuse its discretion by exercising jurisdiction over that declaratory judgment action, even though it concerned a grand jury proceeding in another district. *Id.* Although the Second Circuit ultimately rejected the privilege claim on the merits, it held jurisdiction was proper. *See id.* at 165-67, 174.

For the same reasons, this Court has jurisdiction to consider Plaintiffs' constitutional challenges to production of their medical records. Like the New York Times in *Gonzales,* Plaintiffs are not parties to the grand jury proceeding. As in *Gonzales,* the potential subpoenas would be directed to third parties, *i.e.*, LPCH and other providers located in California. And as in *Gonzales,* they have filed an action seeking relief in the district where they reside and where the information at issue was created. *Gonzales* confirms that it is appropriate for the Court to consider Plaintiffs' challenges on the merits notwithstanding the pendency of the Texas grand jury proceeding.

The Court's prior decision cited *Gonzales* as "authority suggesting that a plaintiff may challenge a grand jury subpoena in the plaintiff's home district instead of moving to quash the subpoena in the district where it was issued (although that case involved a threatened subpoena rather than an already-issued one)." ECF 40 at 15-16 n.32. But it noted that other precedent appears to hold that "[o]nly the issuing court has the power to act on its subpoenas." *Id.* (quoting *In re Sealed Case*, 141 F.3d 337, 341 (D.C. Cir. 1998)). *In re Sealed Case*, however, concerned the issuance of a civil subpoena and relied on a textual analysis of an old version of Federal Rule of Civil Procedure 45.[8] 141 F.3d at 341 (quoting Fed. R. Civ. P. 45(c)(3)(A) (1998)). It considered

---

[8] Notably, Rule 45 was amended in 2013 to transfer jurisdiction over a motion to quash from the "issuing court" to the "court for the district where compliance is required," *i.e.*, a court "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c); *see also* Fed. R. Civ. P. 45(d)(3). Thus, the current version of Rule 45 explicitly permits non-issuing courts where the subpoena recipient resides to quash or modify subpoenas. It permits transfer of a motion to quash by the "court where compliance is required" to the "issuing court" only "if the person subject to the subpoena consents or if the court finds

only the rights of the law firm that received the civil subpoena, and not third parties whose personal information any production might contain. *Id.* at 339. Its analysis does not control here. *Gonzales* squarely addressed the rights of interested parties who did not receive a subpoena and holds that a motion to quash is not Plaintiffs' exclusive remedy. Applying the test that governs declaratory judgment actions, *see Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003), the Second Circuit held that a motion to quash "would not offer the Times the same relief as a declaratory action," because such a motion "is not available if the subpoena has not been issued," as it was unknown whether the third-party recipients had been served "or not, and if so, whether [they] ha[d] already complied," and because it was "unclear whether, when a subpoena has been issued to a third party and the third party has complied, a motion to quash is still a viable path to a remedy." *Gonzales*, 459 F.3d at 167.

That *Gonzales* "involved a threatened subpoena rather than an already-issued one," ECF 40 at 15-16 n.32, does not distinguish this case. The five-factor test still favors allowing Plaintiffs to proceed with a declaratory judgment action. First, a declaration of Plaintiffs' and the proposed class's rights will "serve a useful purpose in clarifying or settling the legal issues," which concern Plaintiffs' constitutional rights. *Gonzales*, 459 F.3d at 167. Second, a declaratory judgment action offers Plaintiffs and the proposed class "relief from uncertainty," because the threat to PHI transcends any single subpoena. *Id.* And because Plaintiffs seek relief that is broader than any specific subpoena, the declaratory judgment action is not merely "procedural fencing," but instead provides a "more effective remedy" for protecting their constitutional rights. *Id.* Because this case does not involve a "state or foreign court," the last factor is "inapplicable on its face." *Id.*

Plaintiffs seek not merely to prevent enforcement of the grand jury subpoena to LPCH, but also to prevent DOJ from obtaining the same information by other means that would violate proposed class members' First and Fifth Amendment rights. Plaintiffs reside in this District,

---

exceptional circumstances." Fed. R. Civ. P. 45(f). These changes to Rule 45 recognize that subpoena recipients, and others impacted by subpoenas, face significant burdens where required to challenge subpoenas issued far from where they live. Fed. R. Civ. P. 45, cmt. to 2013 Amendments ("The prime concern should be avoiding burdens on local nonparties subject to subpoenas.").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

sought care in this District, and entrusted hospitals in this District to protect their privacy. DOJ's violation of the proposed class members' rights, whether through the subpoena or by other investigative means, would occur in this District, where the proposed class members live and their information is stored. This Court has jurisdiction to declare proposed class members' rights under 28 U.S.C. § 2201 and to protect those rights from infringement. *See* pp. 7-8, *supra*. The fact that protecting class members' rights from violation has implications for an existing subpoena in no way deprives this Court of the jurisdiction it would otherwise have under the Constitution and the Declaratory Judgment Act.

### C.    The Grand Jury Context Does Not Foreclose Constitutional Challenge.

The Supreme Court has long recognized that grand jury subpoenas are presumptively reasonable and that grand juries are vested with broad investigative authority. *See generally United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297-301 (1991). But it is equally well established that a grand jury subpoena may not compel production of records or testimony in violation of an individual's constitutional rights. *See, e.g.*, *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1088 (9th Cir. 2016) (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)). "[W]here a grand jury's subpoena . . . would *itself* violate the privacy interests protected by the Fourth Amendment, '[j]udicial supervision is properly exercised in such cases to prevent the wrong before it occurs.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 346 (1974)).

To be sure, in ordinary grand-jury proceedings, "[n]o affidavit of relevance and need must be introduced" and that "legitimate purpose may be derived from the fact that the subpoena is necessary to a legitimate pursuit and the presumption that the government obeys the law." *In re Grand Jury Proceeding*, 721 F.2d 1221, 1223 (9th Cir. 1983). But where an improper purpose appears on the face of a grand jury subpoena, a "unanimous chorus" of courts of appeals, including the Ninth Circuit, "agrees that courts may quash." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. 26-mc-12 (JEB), 2026 WL 710202, at *5 (D.D.C. Mar. 13, 2026) (citing *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972)); *see United States v. Powell*, 379 U.S. 48, 58 (1964) (summons issued for "improper purpose, such as to harass," is an "abuse"). Plaintiffs do not ask this Court to supervise routine grand-jury relevance. They seek only to

prevent an imminent disclosure of their own constitutionally protected medical records in response to requests from DOJ that multiple courts have rejected in the context of substantially similar administrative subpoenas. Multiple federal district courts have quashed those subpoenas—many concluding that DOJ had "issued the subpoena[s] first and searched for a justification second." *QueerDoc*, 807 F. Supp. 3d at 1303. DOJ's response was not to articulate a legitimate investigative need for Plaintiffs' identifying medical records, but to repackage materially similar demands as grand jury subpoenas issued from a forum with no apparent connection to LPCH, proposed class members, or their care. That pattern is strong evidence that judicial review is necessary before Plaintiffs' constitutional rights are extinguished. *See In re Subpoena No. 25-1431-016*, 2025 WL 3562151, at \*13. Constitutional privacy limits apply regardless of the procedural vehicle used to compel disclosure. *See, e.g.*, *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929-31 (7th Cir. 2004) (quashing trial subpoena for patient records on patient-privacy grounds). If anything, DOJ's willingness to shift from one procedural mechanism to another underscores why the proposed class requires broad injunctive relief that bars DOJ from obtaining PHI by any means that would violate Plaintiffs' rights.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DOJ'S DEMAND FOR THEIR IDENTIFYING INFORMATION AND PHI WOULD VIOLATE THEIR RIGHT TO INFORMATIONAL PRIVACY

"[F]ederal constitutional law recognizes a 'right to informational privacy' stemming from 'the individual interest in avoiding disclosure of personal matters.'" *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 768 (9th Cir. 2020) (quoting *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999)); *see also Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024). The Supreme Court first recognized that interest in *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977).[9]

The Ninth Circuit has expressly recognized the right to informational privacy and has applied it to compelled disclosures of medical information by health care providers. *See Doe v. Garland*, 17 F.4th 941, 947 (9th Cir. 2021); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551-

---

[9] The Supreme Court did not reject "the right to shield information from disclosure" in *Dobbs v. Jackson Women's Health Organization*, but instead found that *Roe v. Wade* had "conflated" it with a "very different" "right to make . . . important personal decisions." 597 U.S. 215, 273 (2022).

53 (9th Cir. 2004), *overruled in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Endy*, 975 F.3d at 768. The Ninth Circuit's decision in *Tucson Woman's Clinic* is most instructive. There, Arizona enacted a statutory and regulatory scheme requiring providers of abortion health care to permit "warrantless, unbounded inspections of their offices" by employees of the Department of Health Services and to provide access to patients' unredacted medical records. 379 F.3d at 537. The state also required providers to submit "ultrasound prints with patient identifying information on them to a private contractor" for review. *Id.* at 553. The Ninth Circuit affirmed summary judgment for the providers on their patients' informational-privacy claim. *Id*. DOJ's demand for patient medical records pursuant to the grand jury subpoena here, and broader efforts to obtain the same information by other means, violates Plaintiffs' right to informational privacy for the same reasons set forth in *Tucson Woman's Clinic.*

The Ninth Circuit balances several factors "to determine whether the governmental interest in obtaining information outweighs the individual's privacy interest," namely: "(1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id.* (citing *Planned Parenthood v. Lawall*, 307 F.3d 783, 790 (9th Cir. 2002)). Each factor weighs against disclosure here.

### A.   The Information Requested Is Highly Sensitive.

The first factor weighs heavily against disclosure because the information sought by the subpoena "is extremely broad, and includes patient identifying information such as names and full medical histories." *Id.* at 552. The grand jury subpoena seeks information "sufficient to identify" each LPCH patient who received transgender medical care, and for each such patient, all "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for" that care. ECF 31-2 at 7-8. The records demanded for each proposed class member are among the most sensitive categories of personal information,[10] essentially requiring disclosure of each

---

[10] *See, e.g.*, ECF 3-5 ¶ 4 ("We had very personal conversations with Stanford providers about

class member's complete medical file as it relates to transgender medical care. The Ninth Circuit has repeatedly held that such medical records are "'highly sensitive' personal information" protected by the right to privacy. *Doe*, 101 F.4th at 637 (quoting *Garland*, 17 F.4th at 947).

These privacy interests are especially strong because the records at issue concern minors' medical care. Courts reviewing materially identical government subpoenas have recognized that demands for children's identities and confidential medical records trigger heightened privacy concerns. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 594 (holding that DOJ's demands for children's identities and clinical records implicated "intensely personal and sensitive medical information warranting the highest level of protection"); *In re CNH Subpoena*, 2026 WL 160792, at *8. This factor strongly favors Plaintiffs and the proposed class.

### B.  Nonconsensual Disclosure Would Cause Grave Harm.

The second factor also weighs decisively against disclosure, as "[t]he potential for harm in any subsequent non-consensual disclosure is obviously tremendous[.]" *Tucson Woman's Clinic*, 379 F.3d at 552. That concern is especially acute where, as here, disclosure would reveal information that is stigmatizing or likely to expose a person to discrimination, harassment, or violence. *See Crawford*, 194 F.3d at 960 (disclosure of HIV status or sexual orientation can "lead directly to injury, embarrassment or stigma"); *Powell v. Schriver*, 175 F.3d 107, 111-12 (2d Cir. 1999) (recognizing constitutional privacy interest in transgender status).

The potential for harm is not speculative. Disclosure would expose proposed class members and their families to the risk of harassment, discrimination, damage to educational and employment opportunities, loss of access to health care, government targeting, family separation, and prosecution.[11] Disclosure would also involuntarily reveal proposed class members'

---

fertility, sexuality, mental health, depression, the long-term impacts of medical treatment, and other matters that my daughter would not want disclosed to anyone outside of her care team.").

[11] *See, e.g.*, ECF 3-4 ¶ 10 ("I fear that the government wants to prosecute providers, and possibly even parents, for seeking care that is in the best interests of transgender children. My greatest fear is that the government could try to take my child away from me because I supported his care."); ECF 3-6 ¶ 12 ("Disclosure would make me fear for my family's safety. I am scared of death threats, harassment of my child, and professional consequences for me, including being fired from my job."); ECF 3-8 ¶ 12 ("Disclosure would affect both my son's physical safety and mental health. I am scared for him being outed when he has not chosen to be, especially because he is

transgender status and their receipt of transgender medical care to federal law-enforcement officials. For several Plaintiffs, that information is not publicly known.[12] Involuntary disclosure of a minor's transgender status is itself a serious harm, exposing the child "to stigma, bullying, fear, and violence." *D.T. v. Christ*, 552 F. Supp. 3d 888, 897 & n.8 (D. Ariz. 2021).

That risk is magnified by the context in which DOJ has sought these records. The President has declared that pediatric transgender medical care "must end," and the Attorney General has characterized that care as "mutilation" and a "warped ideology." The Administration's widely publicized campaign, across multiple agencies, to denigrate, investigate, and deter providers from offering and patients from seeking transgender medical care gives rise to a realistic concern that Plaintiffs' information will be broadly disseminated within the government and used for purposes unrelated to any legitimate investigation. Courts reviewing materially identical HIPAA subpoenas have credited the same concern. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 599-600. In this environment, compelled disclosure of Plaintiffs' identities and medical records would expose them and their families to the harms the informational-privacy doctrine exists to prevent.

Disclosure would also harm the doctor-patient relationship.[13] The records at issue were generated in a relationship of trust between patients, parents, physicians, and mental-health providers. Compelled disclosure would breach that relationship and undermine the very conditions that permit accurate diagnosis, effective treatment, and candid disclosure of sensitive information. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 600-01 ("Patients and families who

---

entering high school. His whole life would change if his medical records were disclosed."); ECF 3-9 ¶ 13 ("Disclosure of my records would cause severe emotional harm.").

[12] *See, e.g.*, ECF 3-6 ¶ 5 ("My child has come out to only a couple of people. They are not publicly telling people that they are transgender."); ECF 3-7 ¶ 4 ("My son prefers not to talk about the fact that he is transgender. His friends and many of the people he interacts with do not know that he is transgender."); ECF 3-8 ¶ 5 ("My son is not publicly out as transgender. His school, friends, and community do not know that he is transgender. He is also a very private person generally.").

[13] *See, e.g.,* ECF 3-4 ¶ 11 ("Disclosure would affect our family's willingness to seek care and share sensitive information in the future . . . If Stanford turns over our information, we would never go back there, and it would be incredibly difficult to find providers who are as competent and whom my son would trust."); ECF 3-5 ¶ 5 ("Privacy was essential to my daughter's ability to process what she was experiencing and to speak candidly with providers. She would not have been willing to speak openly with Stanford providers if she knew that information could be disclosed outside the medical-care setting."); ECF 3-7 ¶ 5 ("It was important that my son felt Stanford was a safe place and that the providers were there to help him. Privacy was important to his ability to participate in care.").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns[.]"). If DOJ obtains records relating to the transgender medical care proposed class members' received, then proposed class members will reasonably fear that information disclosed in confidence to health care providers can later be turned over to law enforcement. Courts have repeatedly recognized that such fear chills access to care and undermines candor in treatment. *See, e.g.*, *Nw. Mem. Hosp*, 362 F.3d at 929 (cautioning that hospital "will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment" if it fails to "shield the medical records of its abortion patients from disclosure"); *Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*, No. 03-cv-4872, 2004 WL 432222, at *2 (N.D. Cal. Mar. 5, 2004) ("[P]otential for injury to the relationship between patient and provider is significant ....").

## C.    No Adequate Safeguards Against Unauthorized Disclosure or Misuse

The third factor—the adequacy of safeguards to prevent unauthorized disclosure—also weighs strongly against disclosure. As in *Tucson Woman's Clinic*, there are no adequate protections "against release of information to government employees who have no need for the information." 379 F.3d at 552. "Even if a law adequately protects against public disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information." *Id.* at 551-52. The subpoena itself offers no safeguards or guarantees concerning the use of Plaintiffs' identities or private medical records, no information concerning the investigatory purpose for which the government is seeking the records or to whom they may be disclosed, no details on which government employees will have access to these records, and no assurances that these records will not be used to harass or intimidate Plaintiffs or others who have received transgender health care.

Federal Rule of Criminal Procedure 6(e) does not cure the problem. Although Rule 6(e) establishes some constraints on public disclosure of grand jury information, it contains exceptions permitting disclosure to "an attorney for the government for use in performing that attorney's duty," disclosure to federal or state government personnel "that an attorney for the government

considers necessary to assist in performing that attorney's duty to enforce federal criminal law," and disclosure to another federal grand jury. Fed. R. Crim. P. 6(e)(3)(A)(i), (ii); 6(e)(3)(C). Those exceptions do not meaningfully limit intra-governmental dissemination or prevent use of Plaintiffs' information for purposes far removed from any lawful need for their medical records.

These limitations do not prohibit the government from using information obtained from a grand jury subpoena against patients in other criminal proceedings, or against patients' parents, a group of people whom the government has, in no uncertain terms, accused of child abuse, despite overwhelming evidence that what these parents are doing—supporting their transgender children in lawfully obtaining essential medical care—leads to positive outcomes for these youth. Indeed, DOJ announced its intention to partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners, and the Attorney General directed all U.S. Attorneys to investigate all suspected cases of transgender medical treatment and to prosecute all offenses to the fullest extent possible.[14] *See In re. Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 603 (applying analogous factor to similar requests and concluding that DOJ "offers nothing to mitigate a concern for these children and their families given these pronouncements"). Such information sharing is particularly concerning to any parent who sought lawful, medically recommended care for their transgender child that is now being falsely characterized as abuse.

Recent history also shows a disregard by DOJ for the standards that have traditionally governed grand jury practice. *See United States v. Comey*, 809 F. Supp. 3d 396, 414 (E.D. Va. 2025) (ordering release of grand jury materials after "an FBI agent and a prosecutor" "potentially

---

[14] *See* Memorandum for Select Component Heads re Preventing the Mutilation of American Children, Off. Att'y Gen. at 3-4, 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (directing all U.S. Attorneys to investigate and prosecute all suspected providers of "gender-affirming care," directing other components of DOJ to investigate FCA and FDCA claims based on same, and announcing partnership with state attorneys general to support state-level prosecution of these providers); Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children, Dep't of Just., Off. of Pub. Affs. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical (stating that medical professionals and organizations who provide this care "in the service of a warped ideology will be held accountable by this Department of Justice").

undermine[d] the integrity of the grand jury proceeding").[15] Thus, even if grand jury secrecy could provide adequate protection in some context, the Court should not entrust it to do so here. The third factor strongly favors Plaintiffs.

### D.    No Demonstrated Need for Plaintiffs' Identities or PHI

The fourth factor—the government's degree of need for access—likewise weighs strongly against disclosure. As in *Tucson Woman's Clinic*, "[w]eighing even further against the medical record access is the fact that there is little, if any, need for much of this information, such as the names and addresses of patients." *Id.* at 552. The subpoena offers no indication of the purpose for which Plaintiffs' information is being demanded. It does not state why Plaintiffs' medical records are relevant to any investigation that may be underway, let alone offer any explanation as to why that investigation could not be conducted without that information. This mismatch between the information sought and any legitimate investigative need is fatal under the Ninth Circuit's balancing test. In decisions quashing substantively similar DOJ administrative subpoenas seeking transgender patients' private medical records, numerous district courts have found that DOJ failed to establish any legitimate purpose or need for seeking the identities of transgender patients and the most intimate details of their medical histories and treatment. *See In re CNH Subpoena*, 2026 WL 160792, at *8 ("If the Government is pursuing FDCA violations, it is utterly unclear to this court why the Government demands production of adolescent patient records."); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 605 ("Nothing in the present record establishes a need . . . for the patient-identifying clinical files . . . .").

The Eastern District of Pennsylvania's analysis of substantively identical patient-data requests is especially instructive. The court distinguished between requests for billing data,

---

[15] *See also* Sara Tenenbaum & Todd Feurer, *All charges dismissed against "Broadview Six," defense says grand jury transcript revealed "gross misconduct,"* CBS News (May 22, 2026), https://perma.cc/4JPF-TM6D (prosecutors dismissed charges after the revelation of myriad abuses of the grand jury system, including "improper prosecutorial communications of a substantive nature with the grand jurors outside of the grand jury room"); Benjamin S. Weiss, *DOJ may have disclosed secret grand jury material to Congress, violated judicial gag order in Trump classified documents case*, Courthouse News Service (Mar. 25, 2026), https://perma.cc/9N69-BNKD (reporting that, on March 13, 2026, DOJ produced information to the House Committee on the Judiciary that contained grand jury material).

insurance-claim submissions, coding guidance, communications with insurers, and manufacturer-related materials—which could plausibly relate to the commercial conduct DOJ invoked—and requests for child-patient identities, psychosocial evaluations, diagnoses, treatment rationales, informed-consent forms, intake assessments, and family-authorization documents. The latter materials, the court held, "reflect individualized clinical care and deeply personal medical disclosures" and "do not speak to how products were labeled, marketed, introduced into interstate commerce, or billed to health care benefit plans." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578. The same distinction controls here because Subpoena Specifications 12 through 14 seek the same patient-identifying categories the court in the CHOP case found disconnected from DOJ's stated FDCA and fraud theories. The District of Maryland agreed: "The Government seeks to investigate how the Hospital treats its patients," but "the FDCA regulates commerce, not patient care." *In re CNH Subpoena*, 2026 WL 160792, at *8.

DOJ's own conduct in the administrative subpoena context reinforces the conclusion that patient-identifying information is unnecessary for any legitimate investigation. On May 6, 2026, DOJ dismissed its appeal of the Eastern District of Pennsylvania's order striking Requests 11-13 in the substantively identical subpoena to Children's Hospital of Philadelphia. Br. in Supp. of Mot. to Confirm Jurisdiction at 4, *In re Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa. May 6, 2026) (ECF 47-1). That dismissal confirms what multiple courts have independently concluded: DOJ can pursue any genuine FDCA or fraud investigation without obtaining children's identities or medical files. If DOJ does not need this information to investigate CHOP, it cannot demonstrate any greater need for the information as it relates to LPCH and other hospitals in California.

Moreover, even if the subpoena did not on its face require production of unredacted medical records, redaction of certain items such as names and addresses could not avert the realistic risk of reidentification of Plaintiffs and disclosure of their intimate medical details.[16] In a

---

[16] *See, e.g.,* ECF 3-4 ¶ 12 ("I do not believe removing names or obvious identifiers would protect my child's privacy. Details such as his age, dates of care, treatment history, providers, diagnosis, family circumstances, and location of care could still identify him."); ECF 3-8 ¶ 14 ("I do not believe removing names or obvious identifiers would protect my child's privacy. With advanced technology and the details contained in medical records, I believe it would be easy to identify my son and our family.").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

closely analogous context, the Seventh Circuit affirmed an order quashing a DOJ subpoena for redacted abortion records. *See Nw. Mem'l Hosp.*, 362 F.3d at 929-31. The court emphasized that in a highly charged social environment, acquaintances or "skillful 'Googlers'" can "put two and two together," that granular clinical narratives or descriptions contained in redacted medical records can effectively reidentify patients, and that compelled disclosures erode patients' trust in medical providers and discourage them from seeking needed care. *Id.* That rationale applies with added force to DOJ given the many investigative techniques it has at its disposal. DOJ is not limited to skillful Googling, and can instead serve subpoenas on other entities or compare redacted patient documents to information it has from other databases, such as claims submitted to Medicaid and other federal health programs.

Finally, DOJ seeks the information at issue, which has no legitimate connection to any criminal investigation, for the "improper purpose" of seeking to "end the very practice it claims to be merely investigating." *QueerDoc*, 807 F. Supp. 3d at 1303-04. Current federal directives expressly target transgender health care, describe it as "mutilation," direct government-wide action, and call for coordinated investigations and information sharing with state authorities. This antagonistic environment magnifies every factor identified by the court in *Northwestern Memorial*: the concrete risk of reidentification despite redaction; the dignitary injury from disclosure of intimate details; the severe chilling effect on access to care; and the undermining of institutional trust. In short, DOJ's receipt of even so-called "de-identified" or redacted records would endanger privacy and safety and chill minors' access to medically necessary care. The fourth factor favors Plaintiffs.

### E. No Statutory Mandate, Public Policy, or Recognizable Public Interest Justifies Disclosure of Plaintiffs' Identifying Information and PHI.

The fifth factor—whether an express statutory mandate, articulated public policy, or other recognizable public interest militates toward access—also weighs against disclosure. The primary statutory mandate at issue, HIPAA, ordinarily prohibits medical providers from disclosing PHI. 45 C.F.R. § 164.502(a). While HIPAA ordinarily contains an exception for grand jury subpoenas, 45 C.F.R. § 164.512(f)(1)(ii)(B), an "invalid" grand jury subpoena "may not be used for any

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

purpose," *In re Horn*, 976 F.2d 1314, 1319 (9th Cir. 1992), including to establish an exception to HIPAA. HIPAA's mandate thus weighs against disclosure here.

The subpoena does not reveal how disclosure of Plaintiffs' identifying information and PHI promotes any identifiable public interest. To the contrary, the record indicates that DOJ is using the grand jury subpoena to obtain the same patient-identifying records that multiple courts have already held it was not entitled to obtain through materially similar administrative subpoenas. Even if the government could show some legitimate purpose for its investigation generally, nothing in the subpoena indicates how disclosure of Plaintiffs' identities and PHI "promotes this need." *Tucson Woman's Clinic*, 379 F.3d at 553. Under *Tucson Woman's Clinic*, a generalized invocation of a public interest in law enforcement cannot automatically override constitutional privacy rights in highly sensitive medical records. If it could, the balancing test would have no force in the very cases where it matters most. The government must identify a concrete and particularized interest in the specific information sought. It has not done so.

The articulated public policy surrounding the subpoena cuts the other way. The Administration has publicly declared that pediatric transgender medical care "must end," described this care in stigmatizing and inflammatory terms, and directed DOJ to use federal enforcement tools to end it. In related subpoena litigation, courts have repeatedly found that DOJ's demands for transgender minors' identifying information and PHI were tied to an improper effort to target this care rather than any legitimate need for children's medical files. *See QueerDoc*, 807 F. Supp. 3d at 1304 ("[T]he subpoena serves to pressure providers to cease offering gender-affirming care rather than to investigate specific unlawful conduct."); *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8 ("[T]he Subpoena is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare."); *In re 2025 Admin. Subpoena to R.I. Hosp.*, 2026 WL 1392565 , at *8 ("The Administration has publicly characterized gender-affirming care for minors as abuse, directed the DOJ to bring its practice to an end, and celebrated when hospitals curtailed such programs as a result of this subpoena campaign.").

The public interest favors protecting minors' medical privacy, preserving the

confidentiality of the doctor-patient relationship, preventing misuse of law-enforcement authority to expose stigmatized medical information, and ensuring that patients and families can seek lawful medical care without fear that their most intimate records will be turned over to the federal government. The fifth factor strongly favors Plaintiffs.

In sum, an assessment of the *Tucson Woman's Clinic* factors shows that LPCH's disclosure of Plaintiffs' identifying information and PHI would violate Plaintiffs' informational privacy rights. Plaintiffs are likely to succeed on this claim. At a minimum, Plaintiffs raise serious questions going to the merits, warranting preliminary relief to prevent disclosure while this action proceeds.

**III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DOJ'S REQUESTS FOR THEIR INFORMATION VIOLATE THE FIRST AMENDMENT**

"Throughout history, governments have 'manipulat[ed] the content of doctor-patient discourse' to increase state power and suppress minorities.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018). But free and open communication between medical providers, patients, and their families is protected by the First Amendment. *Id.* "Physicians must be able to speak frankly and openly to patients." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) (upholding a permanent injunction of government investigations into doctors recommending medical marijuana). For this reason, the Ninth Circuit has long recognized the First Amendment's protection of communications between doctors and providers and their patients, particularly where the government discriminates based on viewpoint. *See id.* at 673; *see also Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (finding likelihood of success and affirming preliminary injunction where law "forbids expression of a particular viewpoint" in doctor-patient communications).

The Supreme Court has recently held that subpoenas can infringe First Amendment rights. *Davenport*, 146 S. Ct. at 1125. In *Davenport*, the New Jersey Attorney General subpoenaed information about a nonprofit's donors to investigate whether the organization had "misled" them. *Id.* at 1120. The Supreme Court held that the issuance of the subpoena "established a present injury to [the recipient's] First Amendment associational rights" for purposes of Article III

standing. *Id.* at 1124. Because the recipient's "prospective partners would be hesitant to risk the revelation of their personal information through government investigation," the subpoena discouraged "people from associating with groups" and also encouraged "groups and individuals to cease or modify protected First Amendment advocacy the government disfavors." *Id.* at 1125.

The grand jury subpoena here will encourage members of the proposed class to "cease or modify protected First Amendment" communications with their doctors, both at LPCH and at any other healthcare provider. *Davenport*, 146 S. Ct. at 1125. Courts have recognized that "[p]atients and families who believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns[.]" *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 600-01; *see also Nw. Mem. Hosp*, 362 F.3d at 929 (cautioning that hospital "will lose the confidence of its patients" if it fails to "shield the medical records of its abortion patients from disclosure"). The individual Plaintiffs have submitted declarations stating that they "would not have been willing to speak openly with LPCH providers if [they] knew that information could be disclosed outside the medical-care setting." B.B. Decl. dated June 8, 2026 ("B.B. Decl.") ¶ 5.[17]

The grand jury subpoenas will additionally deprive Plaintiffs and the proposed class of their right to receive the candid guidance from their providers in California-based hospitals that does not align with DOJ's beliefs regarding transgender healthcare. It is well-established that the First Amendment protects good-faith medical and scientific disagreement. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1022-23, 1029 (2026). Where the government has taken action to limit a provider's ability to communicate a certain perspective or provide information on certain care, such actions are subject to strict scrutiny. *See id.* Here, the subpoenas seek vast troves of information on any individual who "underwent Sex-Rejecting Procedures." The definition of "Sex Rejecting Procedures" includes medical and clinical interventions, as well as clinical services that are "functionally integral to, preparatory for, or undertaken in furtherance of" those interventions. The subpoena thus seeks records concerning even purely preliminary discussions, intakes, or

---

[17] *See also* ECF 3-7 ¶ 5 ("It was important that my son felt Stanford was a safe place and that the providers were there to help him. Privacy was important to his ability to participate in care.").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

evaluations. Knowing that their speech in such encounters regarding gender-related care will be scrutinized, doctors will limit their communications with their patients on these topics. This, in turn, will deprive Plaintiffs and the proposed class of their right to receive these communications. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[T]he protection afforded is to the communication, to its source and to its recipients both.").

The First Amendment harm is particularly acute here because the grand jury subpoena to LPCH discriminates based on "viewpoint." *Planned Parenthood*, 122 F.4th at 844. The subpoena's definition of "Sex Rejecting Procedures" includes medical procedures only when they have the "purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex." ECF 31-2 at 6. Whether communications fall within the subpoena's scope thus depends on whether the minor "assert[s]" a "gender identity" that differs from their "biological sex." The subpoena is clear that an "intervention is considered a Sex-Rejecting Procedure based on its intended purpose." *Id.* Two identical prescriptions can be treated differently under the subpoena based entirely on the patient's and the doctor's viewpoint about potential differences between gender and sex. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Because the grand jury subpoena discriminates based on viewpoint and will chill protected communications, Plaintiffs are likely to succeed on their First Amendment claims.

IV.   **PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The irreparable harm standard is satisfied as to each Plaintiff, and the proposed class. The Ninth Circuit has held that the threatened deprivation of constitutional rights, for even minimal periods of time, "unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002 (quoting *Elrod*, 427 U.S. at 373). That rule applies here because Plaintiffs have shown, at a minimum, serious questions that DOJ's receipt of their PHI would violate their constitutional rights. In any event, the harm to proposed class members from disclosure is independently irreparable on its own terms. Once DOJ obtains the records from any source, proposed class

members' privacy interest in the information the records contain is permanently and irrevocably destroyed. The federal government will possess records of the most intimate details of each class member's medical history—including the diagnoses and clinical assessments that supported each member's care; the specific treatments received; and the results of that care—obtained without notice or any opportunity for proposed class members to object on grounds of privilege or constitutional protection. No damages award can restore the confidentiality of that information.

The harm is also imminent. The return date for the grand jury subpoena issued to LPCH is June 10, 2026. On information and belief, other California hospitals may have the same return date. Without a TRO issued before that date, the constitutional harm will be complete as to proposed class members and the Court will no longer have any effective means of providing the relief sought in this litigation. The imminence of the constitutional harm is not speculative—it will occur within this District on a specific known date absent judicial intervention.

The pendency of the grand jury proceeding in the Northern District of Texas heightens, rather than diminishes, the need for emergency relief here. Plaintiffs' records, providers, and treatment relationships are in this District, and Defendants are subject to this Court's personal jurisdiction. LPCH's production of Plaintiffs' private medical records would occur from California. Plaintiffs have no records, residence, treatment relationship, or other connection to Texas that would make it reasonable to require them to seek relief there on the eve of disclosure. This Court is the forum with the most direct connection to Plaintiffs and the threatened injury.

## V. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF PRELIMINARY RELIEF

The balance of equities tips sharply in favor of granting preliminary relief to preserve the status quo and prevent an irreparable infringement of Plaintiffs' constitutional rights. Denial of relief would result in the permanent and irreversible destruction of Plaintiffs' privacy interest in their identifying information and PHI. This is a harm that, once inflicted, cannot be undone regardless of how this litigation ultimately resolves. DOJ, in contrast, would suffer no cognizable harm from interim relief. The government has no cognizable interest in obtaining Plaintiffs' records by unconstitutional means. If the subpoena is constitutionally permissible, contrary to

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

what at least eight federal district court decisions have found, then the government suffers nothing but a temporary delay in reviewing Plaintiffs' records, one small part of an investigation that the government's public statements confirm has gone on for nearly 12 months and involve its attempt to obtain the records of every patient treated by more than 20 doctors and clinics around the country. In a similar proceeding in the Southern District of New York relating to the grand jury subpoena served on NYU Langone, DOJ agreed not to require any New York City hospital to "produce or disclose any material covered by the lawsuit (i.e., identifying and sensitive health information) . . . before June 24, 2026." *Coe v. Blanche*, No. 1:26-cv-4641, ECF 21 at 1 (S.D.N.Y.). The time period covered by that agreement, 14 days after the subpoena's return date, is exactly what would be covered by the TRO requested here.

The public interest also strongly favors relief. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)). The public interest here is amplified by the scope of the threatened constitutional violation. The government's simultaneous targeting of multiple transgender individuals who reside in this District—and many more proposed class members across California—highlights the public importance of ensuring that any investigation is conducted through constitutionally valid methods. If this Court denies preliminary relief, the government's improper effort to deter pediatric transgender medical care will proceed unchecked. The privacy of multiple residents of this District will be permanently compromised, and the chilling effect on transgender individuals' willingness to seek medically necessary care will be felt across the community. This Court's intervention to ensure constitutional compliance before widespread harm is inflicted is squarely in the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a temporary restraining order barring DOJ from obtaining proposed class members' PHI in violation of their constitutional rights for fourteen days, and that it further issue an order to show cause why a preliminary injunction should not issue before the temporary restraining order expires.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO

DATED:  June 8, 2026

SHANNON P. MINTER – 168907
CHRISTOPHER F. STOLL – 179046
AMY WHELAN – 215675
RACHEL BERG*
NATIONAL CENTER FOR LGBTQ
RIGHTS
1401 21st Street #11548
Sacramento, California  94102
Telephone:    (415) 392-6257
Email:
sminter@nclrights.org
cstoll@nclrights.org
awhelan@nclrights.org
rberg@nclrights.org

GAY C. GRUNFELD – 121944
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:
ggrunfeld@rbgg.com
kjanssen@rbgg.com

Respectfully submitted,

*/s/ Caleb Hayes-Deats*

CALEB HAYES-DEATS*
ABBE DAVID LOWELL*
SCHUYLER STANDLEY*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC  20005
Telephone: (202) 964-6110
Facsimile: (202) 964-6116
Email:
CHayes-Deats@lowellandassociates.com
ALowellpublicoutreach@lowellandassociates.com
SStandley@lowellandassociates.com

JOSHUA ROVENGER*
DONOVAN BENDANA*
GLBTQ LEGAL ADVOCATES &
DEFENDERS (GLAD LAW)
18 Tremont Street, Suite 950
Boston, Massachusetts  02108
Telephone:    (617) 426-1350
Email:
jrovenger@gladlaw.org
dbendana@gladlaw.org


Attorneys for Plaintiffs
*motion for admission *pro hac vice* granted

Case No. 5:26-cv-04998
PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRO